*CJP Supp. 85 Opinion
GROSSMAN, Chairperson.
I. INTRODUCTION AND SUMMARY
This disciplinary matter concerns Judge Kevin A. Ross of the Los Angeles County Superior Court. On August 30, 2004, the commission filed its first amended notice of formal proceedings against Judge Ross in which it charges Judge Ross with the following misconduct:
*CJP Supp. 86 Count 1 charges that Judge Ross committed a variety of misconduct while presiding over four unrelated criminal cases between August 2001 and April 2003, including that he interfered with and abridged the defendants’ constitutional rights to counsel and to fair hearings and against self-incrimination, abused his judicial authority, and became embroiled in two of the pending cases.
Count 2 charges Judge Ross with unapproved absences from court on two different days in connection with community outreach activities.
Count 3 charges that the judge made improper comments about pending cases during appearances he made on Life & Times Tonight, a television program produced by and shown on KCET, a public broadcasting station in Los Angeles.
Count 4 charges Judge Ross with acting as a private arbitrator during the filming of a pilot television program that was intended to be and was used to market and promote a proposed new syndicated “reality” series. The tentative name of the show was Mobile Court, the television pilot featured Judge Ross adjudicating actual private disputes at the scenes of the controversies.
The Supreme Court appointed three special masters who held an evidentiary hearing and reported to the commission. The masters are Hon. Judith L. Haller, Associate Justice of the Court of Appeal, Fourth Appellate District, Division One; Hon. Vincent J. O’Neill, Jr., Judge of the Ventura County Superior Court; and Hon. Michael A. Smith, Judge of the San Bernardino County Superior Court. The hearing before the masters took place in Pasadena over four days, November 15 through 18, 2004, followed by oral argument before them on February 10, 2005. The masters presented their detailed 77-page report to the commission on April 18, 2005.
The masters concluded that Judge Ross committed one instance of willful misconduct, four instances of prejudicial misconduct, and one instance of improper action. They concluded that the commission had failed to prove any misconduct in five of the subcounts.
For reasons we explain, we determine there were four instances of willful misconduct, two instances of prejudicial misconduct, one instance of improper action, and that no misconduct was proven respecting four subcounts. In addition, there is clear and convincing evidence of a pervasive lack of *CJP Supp. 87 candor and accountability on Judge Ross’s part during the proceedings, compelling the conclusion that he is fundamentally unsuited to be a judge.
Based on the testimony and evidence adduced at the hearing before them, the masters repeatedly stated in their report that they disbelieved Judge Ross’s testimony and claimed defenses. We have the same reaction to that testimony and evidence. Moreover, subsequent to the masters’ hearing, Judge Ross has confirmed by his arguments and conduct before this commission that his lack of veracity and refusal or inability to be accountable for his actions are persistent and profound.
Subsequent to the masters’ hearing, Judge Ross submitted three briefs to the commission pursuant to Rules of the Commission on Judicial Performance, rule 130. We have studied those briefs, and they are discussed in this decision. We also have had the opportunity to listen to Judge Ross and observe him during his personal hour-long oral argument before us on August 24, 2005. (Selected excerpts from the transcript of the oral argument are set forth and discussed in this decision.) Following the oral argument before the commission, we requested a supplemental brief from the parties on the subject of whether removal was the appropriate remedy in this matter. We have reviewed that fourth brief from Judge Ross.
Cumulatively, these presentations that follow the masters’ hearing and report move us beyond the masters’ expressed doubts concerning Judge Ross’s capacity for truth telling. Judge Ross’s manifest and pervasive lack of honesty and accountability throughout these proceedings compels our unanimous conclusion that we must remove him from office. Our mandate to protect the public requires nothing short of that ultimate sanction. While Judge Ross is presented as a role model and community leader, we nonetheless are constrained to conclude that he should not remain on the bench.
Judge Ross is represented by Edward P. George, Jr., of Long Beach. The examiners for the commission are commission trial counsel Jack Coyle and commission assistant trial counsel Valerie Marchant.
H. GENERALLY APPLICABLE LEGAL PRINCIPLES
A. BURDEN OF PROOF
The commission has the burden of proving the charges against Judge Ross by clear and convincing evidence. (Doan v. Commission on Judicial *CJP Supp. 88 Performance (1995) 11 Cal.4th 294, 313 [45 Cal.Rptr.2d 254, 902 P.2d 272] (Doan); Geiler v. Commission on Judicial Qualifications (1973) 10 Cal.3d 270, 275 [110 Cal.Rptr. 201, 515 P.2d 1].) “Evidence of a charge is clear and convincing so long as there is a ‘high probability’ that the charge is true. [Citations.] The evidence need not establish the fact beyond a reasonable doubt.” (Broadman v. Commission on Judicial Performance (1998) 18 Cal.4th 1079, 1090 [77 Cal.Rptr.2d 408, 959 P.2d 715] (Broadman).)
B. LEVELS OF MISCONDUCT
The levels or types of judicial misconduct that may subject a judge to discipline by the commission are described in article VI, section 18, subdivision (d), of the California Constitution. We summarize each of them.
1. Willful Misconduct
The most serious form of wrongdoing is willful misconduct, defined as consisting of (1) unjudicial conduct that is (2) committed in bad faith (3) by a judge acting in his or her judicial capacity. (Broadman, supra, 18 Cal.4th at p. 1091; Dodds v. Commission on Judicial Performance (1995) 12 Cal.4th 163, 172 [48 Cal.Rptr.2d 106, 906 P.2d 1260] (Dodds).)
In order to determine whether a judge’s conduct is “unjudicial” under the first prong of the foregoing standard, the conduct is measured with reference to the California Code of Judicial Ethics. (Dodds, supra, 12 Cal.4th at p. 172; accord, Oberholzer v. Commission on Judicial Performance (1999) 20 Cal.4th 371, 395 [84 Cal.Rptr.2d 466, 975 P.2d 663] (Oberholzer).)
The “bad faith” requirement for willful misconduct is satisfied when a judge is “(1) performing a judicial act for a corrupt purpose (which is any purpose other than the faithful discharge of judicial duties), or (2) performing a judicial act with knowledge that the act is beyond the judge’s lawful judicial power, or (3) performing a judicial act that exceeds the judge’s lawful power with a conscious disregard for the limits of the judge’s authority.” (Broadman, supra, 18 Cal.4th at p. 1092.)
The “judicial capacity” prong of the willfulness test has been defined as follows: “A judge is acting in a judicial capacity while performing one of the functions, whether adjudicative or administrative in nature, that are associated *CJP Supp. 89 with the position of a judge or when the judge uses or attempts to use the authority of the judicial office for an improper purpose.” (Broadman, supra, 18 Cal.4th at p. 1104, citing Dodds, supra, 12 Cal.4th at p. 172.)
2. Prejudicial Misconduct
The Supreme Court has defined prejudicial misconduct, the second most serious category of judicial misconduct, as follows: “Prejudicial conduct is distinguishable from willful misconduct in that a judge’s acts may constitute prejudicial conduct even if not committed in a judicial capacity, or, if committed in a judicial capacity, not committed in bad faith. Prejudicial conduct is ‘either “conduct which a judge undertakes in good faith but which nevertheless would appear to an objective observer to be not only unjudicial conduct but conduct prejudicial to public esteem for the judicial office” [citation] or “willful misconduct out of office, i.e., unjudicial conduct committed in bad faith by a judge not then acting in a judicial capacity” [citation].’ [Citation.] In this context, bad faith means a culpable mental state beyond mere negligence and consisting of either knowing or not caring that the conduct being undertaken is unjudicial and prejudicial to public esteem. In sum, to constitute prejudicial conduct, a judge’s actions must bring ‘the judicial office into disrepute,’ that is, the conduct would appear to an objective observer to be prejudicial to ‘ “public esteem for the judicial office.” ’ [Citation.]” (Broadman, supra, 18 Cal.4th at pp. 1092-1093.)
3. Improper Action
The least serious type of judicial misconduct is improper action. It consists of conduct that violates the California Code of Judicial Ethics, but that does not rise to the level of prejudicial misconduct. (Rothman, Cal. Jud. Conduct Handbook (2d ed. 1999) § 13.29, pp. 386-387.) Improper conduct includes conduct that an objective observer aware of the circumstances would not deem to have an adverse effect on the reputation of the judiciary. (See Adams v. Commission on Judicial Performance (1995) 10 Cal.4th 866, 897-899 [42 Cal.Rptr.2d 606, 897 P.2d 544] (Adams II) [judge’s acceptance of gifts violated canons but in and of itself did not jeopardize the judge’s objective appearance of independence and impartiality and thus was improper action, not prejudicial misconduct].)
C. JUDICIAL VERACITY
The Supreme Court has stated unequivocally that honesty is a minimum qualification for every judge. (Kloepfer v. Commission on Judicial Performance (1989) 49 Cal.3d 826, 865 [264 Cal.Rptr. 100, 782 P.2d 239] *CJP Supp. 90 (Kloepfer).) If the essential quality of veracity is lacking, other positive qualities of the person cannot redeem or compensate for the missing fundamental. (Ibid.)
Moreover, a judge who is willing to fabricate justifications for a challenged ruling demonstrates “misconduct of the worst kind, evidencing moral turpitude and dishonesty.” (Ryan v. Commission on Judicial Performance (1988) 45 Cal.3d 518, 535 [247 Cal.Rptr. 378, 754 P.2d 724] (Ryan).) Lack of candor toward the commission is uniquely and exceptionally egregious. (Adams II, supra, 10 Cal.4th at p. 914; see also Doan, supra, 11 Cal.4th at p. 338 [by urging witnesses to conceal information from commission, judge commits willful misconduct]; Fletcher v. Commission on Judicial Performance (1998) 19 Cal.4th 865, 888-891 [81 Cal.Rptr.2d 58, 968 P.2d 958] (Fletcher) [by forwarding copy of altered court record to commission, judge commits willful misconduct].)
In Adams II, the California Supreme Court concluded that Judge Adams had engaged in a variety of misconduct, including four instances of willful misconduct in “making material misstatements or omissions to the Commission.” (Adams II, supra, 10 Cal.4th at p. 914.) The court held that misleading the commission “in particular” warranted the removal of the judge from office. (Ibid.) The highest courts in Michigan and in New York also have upheld the removal of a judge based particularly on lack of veracity, including toward the judicial conduct board in each state.
In Michigan Judicial Tenure Commission v. Ferrara (1998) 458 Mich. 350 [582 N.W.2d 817], the Michigan Supreme Court ordered Judge Ferrara removed solely for fraud and lying to the press, the master and the commission. The court did not determine whether the initial charges of misconduct had been proven.
Similarly, in In re Collazo (1998) 91 N.Y.2d 251 [668 N.Y.S.2d 997, 691 N.E.2d 1021], New York’s highest court ordered Judge Collazo removed based on his deceitful conduct during the investigation of the initial wrongdoing, noting that the original misconduct alone would not warrant removal. Commenting on the “lack of candor” and upholding the New York commission’s recommended removal, the Court of Appeals stated, “Particularly relevant here is our conviction that ‘deception is antithetical to the role of a Judge who is sworn to uphold the law and seek the truth’ [citations].” (668 N.Y.S.2d at p. 999.)
*CJP Supp. 91 III. COUNT 1: MISCONDUCT TOWARD CRIMINAL DEFENDANTS
There are four subparts to count 1, each alleging misconduct by Judge Ross in a separate criminal matter over which he presided. Count ID involves defendant Debra Fuentes. We discuss it first because it shows a shocking abuse of power and disregard of fundamental rights, as well as clear examples of lack of candor and accountability by Judge Ross. The judge’s response to the charges and the evidence demonstrate clearly his failure or refusal to acknowledge the implications of his wrongdoing. The Fuentes matter, thus, presents an important framework for viewing the remainder of the wrongdoing.
A. COUNT ID—PEOPLE V. DEBRA FUENTES
1. Findings of Fact
We paraphrase and adopt the following basic findings of the masters. The Fuentes hearing occurred during a busy traffic arraignment calendar over which Judge Ross presided on the morning of April 21, 2003. Ms. Puentes had two old outstanding traffic citations, and the description of her differed on each citation. On the citation from May 1995 (for violating the seatbelt law), she was described as five feet four inches, 250 pounds, and bom April 25, 1967. On the other citation from February 1996 (for no driver’s license and violating the seatbelt law), she was described as five feet seven inches, 180 pounds, and bom April 25, 1965. The signatures on each citation also appear to differ.
At the hearing, Ms. Puentes presented Judge Ross with a “Wrong Defendant” declaration to assert she was not the person actually cited. Her self-description on the declaration matched the height-weight-birth information on the 1995 citation, but not the other citation. She also gave Judge Ross a grocery store identification card.
Judge Ross examined the Wrong Defendant declaration, the citations and grocery ID card, and then told the defendant, “I believe you’re lying to me. I believe all [sic] these tickets are yours.” He unilaterally added a misdemeanor count to the charges in both cases, and summarily sentenced the defendant to jail for 30 days; Ms. Puentes was taken into custody immediately. The new charge, noted in Judge Ross’s handwriting as “Count 3” in each case, was stated to be a violation of a statute making it a misdemeanor knowingly to *CJP Supp. 92 provide false evidence of automobile insurance to a peace officer or court clerk in connection with financial responsibility laws. Judge Ross also wrote on Ms. Fuentes’s Wrong Defendant declaration “Don’t Return ID card.”
The judge entered a “not guilty” plea for the defendant. However, she was never arraigned in the sense of being advised either of the charges against her or of her other constitutional rights, including her rights to counsel and to a hearing. Judge Ross did not notify either the prosecutor or the public defender that he had added misdemeanor charges.
Ms. Fuentes remained in jail until she was released on bail on the evening of April 23—two and one-half days after Judge Ross ordered her incarcerated. She testified before the masters that she was not told the nature of the charges against her, had no idea why she was jailed, and apparently never has learned why Judge Ross ordered her jailed.
In their report, the masters note Judge Ross’s testimony that his handling of the Fuentes matter “was a complete error” and a “screw-up,” and a total “mess.” They go on to describe in detail what they call his “troubling statements” that he made in an effort to minimize his “mess,” as follows:
a. Taking Immediate Steps to Rectify Error: The masters disbelieved the judge’s claim that he “took immediate steps” and did “everything in [his] power to rectify a terrible wrong.” We also reject the claim because the clear evidence is to the contrary.
The judge testified that the day after he incarcerated Ms. Fuentes, he told his clerk, Mary Wechter, to contact Commissioner Michael Devanas, the master calendar judge, to have Ms. Fuentes released. The masters found, and we concur, that the judge’s testimony is inconsistent with and undermined by the more credible testimony of Commissioner Devanas and Judge David Sotelo (the “site judge,” that is, the supervising judge of the court facility where Judge Ross was assigned at the time) concerning when they learned of the Fuentes matter. Judge Sotelo testified that he did not learn of the Fuentes matter until three days later, on April 24, and that he immediately contacted Commissioner Devanas. The commissioner testified his first knowledge of the case came during that telephone call from Judge Sotelo.
The testimony of these two credible witnesses thoroughly undermines Judge Ross’s claim of taking “immediate” remedial action. Nonetheless, and *CJP Supp. 93 notwithstanding that the masters had rejected Judge Ross’s claim—because it was discredited by the other bench officers—the judge still persisted in arguing before the commission that he promptly took remedial action.
Judge Ross’s testimony before the masters that he directed his clerk to contact the commissioner also is inconsistent with the judge’s response of September 26, 2003, to the commission’s second preliminary investigation letter. There, he represented that he personally made the call to Commissioner Levanas. The masters justifiably disbelieved Judge Ross when he tried to reconcile the two responses by saying that the earlier reference to himself was, in effect, an “imperial I” that included his clerk. Also, in his answer,[1] Judge Ross again stated under oath that he “told Ms. Wechter to contact [Commissioner Levanas].” In any case, Commissioner Levanas’s testimony that he first learned of the Fuentes matter from Judge Sotelo on April 24 negates an earlier call from either Judge Ross or his clerk.
As noted by the masters, at the time of the Fuentes case, Judge Ross knew he was under investigation by the commission concerning his handling of the Carrillo, Aka and Salcido cases (counts 1A, IB and 1C, discussed post). In fact, Judge Ross testified that the reason he notified Judge Sotelo was that he thought the Fuentes case would become part of the commission’s pending investigation. By his own admission then, he was worried that his “mess” in the Fuentes matter would not just disappear, and was concerned about this commission. We conclude Judge Ross reported himself to his supervising judge to improve his own position later in these proceedings. He was not trying to rectify his errors by minimizing the harm to Ms. Fuentes.
b. Fuentes’s Alleged Persistent Arguing: Judge Ross testified he remembered feeling “ ‘very frustrated’ because Fuentes kept insisting that she was not the person on the citations.” Even assuming Ms. Fuentes did persist in asserting her innocence, there was no reasonable basis for Judge Ross to have become so “frustrated” in response that he would usurp the function of the prosecutor to add additional charges, and then summarily incarcerate her on the new charges. In fact, the more persuasive evidence shows the defendant was not being persistent. Ms. Fuentes testified before the masters that the proceedings were handled in a summary manner, with little or no opportunity for her even to speak. Previously, she told commission staff that the judge sounded “mad,” and that she did not say anything.[2]
*CJP Supp. 94 c. Fuentes’s Alleged Presentation of “Insurance Documents”: The masters also questioned Judge Ross’s claim that he added the charges of providing false evidence of insurance against the defendant because she gave him insurance documents. In our view the claim is fabricated.
Ms. Fuentes specifically denied bringing insurance papers with her to court. Also, when Judge Ross reported the Fuentes matter to Judge Sotelo, he made no mention that the defendant presented false insurance documents. Further, if such documents were the basis of charging a new crime, it strains credulity that Judge Ross, a former prosecutor, would have returned them. They were the evidence of the alleged new crime. Finally, the judge’s note in the file is “Don’t Return ID card”; he did not direct the retention of insurance papers.
Even if insurance papers somehow were involved, Judge Ross has never satisfactorily explained how that fact figured into his decision to charge the defendant with any new crimes. He did testify that a bailiff once told him a judge could add charges concerning false insurance papers. The judge could not recall the name of the bailiff and we disbelieve the story. Additionally, we do not believe Judge Ross, an eight-year veteran prosecutor, in fact thought that as a judge he could make charging decisions, let alone because a bailiff said he could. The entire “insurance papers” story is incredible and we reject it.
As the masters correctly noted, the story about insurance papers is a diversion from the egregious act of the judge adding any charges—and his failure to appreciate the latter as serious misconduct. When Judge Ross reported on the Fuentes matter to Judge Sotelo on April 24, he mentioned only that he added a “wrong charge”—not that he was wrong in adding a new charge. Judge Sotelo confirmed that Judge Ross reported he had made a mistake concerning the nature of the charge he had added. Combined, these statements show that three days after he made his mistakes in the Fuentes matter, Judge Ross still did not appreciate that his real error was to have usurped the prosecutorial function of adding new charges—not merely charging the wrong offense—and incarcerating the defendant on the spot, in the absence of any due process, based on his newly added charges. (Ibid.)
d. Claimed Referral to Another Court for Arraignment and Counsel: The masters rejected Judge Ross’s additional claim during his testimony and at oral argument before them that he thought that before Ms. Fuentes was incarcerated, she would be sent to another courtroom, where counsel would *CJP Supp. 95 be provided in connection with a proper arraignment. As described by the masters, there was no expectation of such an occurrence in the absence of some action by Judge Ross to bring about such a result. Indeed, by his order, she was to go directly to jail, and that is exactly what happened. We find this claim, too, is fabricated.
e. Claimed Automatic Release on Bail: The masters also found unpersuasive Judge Ross’s claim that he had a “reasonable expectation” Ms. Fuentes would be released as a matter of standard court or jail policy. According to the judge, because of overcrowding in the jail, anyone with bail under $26,000 in a misdemeanor or infraction case is automatically released. There is no evidence of such a policy beyond the judge’s claim. The fact that Ms. Fuentes was not automatically released raises doubts whether the policy in fact exists at all and, if so, whether it is as Judge Ross describes it.[3]
If in fact Judge Ross realized the true nature of his wrongdoing, or if he truly were concerned about rectifying his mistakes, we are convinced he could and would have taken affirmative and effective steps to ensure Ms. Fuentes’s prompt release by issuing an order to that effect, rather than leave it to claimed assumptions. (This latter issue is discussed further (post, pp. 96-99) in connection with Judge Ross’s oral argument before the commission.)
f. Claimed Admission of “Screw-up”: A few weeks after the Fuentes case, Judge Sotelo reminded various traffic court judges assembled at a meeting that they should not incarcerate defendants for traffic infractions. When one of the other judges expressed surprise at the idea of anyone doing such a thing, Judge Ross stated that he had “screwed up.” The masters viewed Judge Ross’s “admission” in front of his colleagues as mitigating behavior. However, in light of all the indicators that show Judge Ross neither understands nor accepts the true extent or ramifications of what he did, his “admission” was superficial, at most. Further, mitigation does not operate to counteract basic dishonesty (Kloepfer, supra, 49 Cal.3d at p. 865) or maliciously motivated misconduct (Adams II, supra, 10 Cal.4th at pp. 911-912, citing Spruance v. Commission on Judicial Qualifications (1975) 13 Cal.3d 778, 800 [119 Cal.Rptr. 841, 532 P.2d 1209] (Spruance)).
*CJP Supp. 96 g. The Realization of Mistake “Trigger Case”: In Judge Ross’s verified answer to the charges, he stated that his concern that he had made a mistake in the Fuentes matter was triggered the following day by a similar case that he handled differently. The judge told a similar story to the masters; he testified that he first became concerned about what he had done in the Fuentes matter that same evening, and that the next morning, he had an “immediate” reaction when he handled an “identical” case. However, Judge Ross could remember no details at the masters’ hearing concerning the supposed “trigger case.” The inescapable conclusion is that there was no such case and that the story is made up.
The examiner asserts the story was engendered by the judge’s concern about the pending commission investigation and his intent to have this commission believe that he quickly realized his mistake and promptly undertook to rectify it. The judge accuses the examiner of unreasonably expecting the judge to remember the details of the one case from among the estimated 10,000 to 20,000 cases he had handled between the time of “that case” in April 2003 and the time of the masters’ hearing in November 2004.
The judge’s argument illustrates he is quick to blame someone else—this time, the examiner—and he twists the facts, to adjust them to the moment. The issue here is not the time lapse between April 2003 and November 2004. Judge Ross first raised the issue of the “trigger case” in his answer in September 2004, just two months before the master’s hearing. By the time of the hearing, he allegedly had forgotten all details of the alleged “trigger.” We believe the judge invented the “trigger case” as part of his discredited claim that he quickly realized his mistake, hoping to minimize his problems later with the commission. Even if that was not his motivation, we do not believe the story that there was a second case that caused an awakening. When Judge Ross called Judge Sotelo three days later, he still did not appreciate what he had done.
h. Claimed “Inability to Find” the Defendant to Release Her: Judge Ross’s inability or refusal to be forthright concerning the Fuentes matter was driven home during oral argument before the commission. Commission member Judge Rise Pichón asked Judge Ross, in light of his claim that he realized his mistake the morning after he jailed Ms. Fuentes, why he did not simply order her released at once. In his evasive response, Judge Ross contradicted himself repeatedly. The complete series of questions by the three judge members of the commission on this issue, and Judge Ross’s comments, are set forth here:
“JUDGE PICHON: Judge Ross, you indicated you were very concerned about your actions in remanding Ms. Fuentes, so you asked your clerk to pull the file for you. [f] When you had the file pulled, why didn’t you immediately release her at that time?
*CJP Supp. 97 “JUDGE ROSS: In downtown Los Angeles, where we are, we are at the Metropolitan courthouse, individuals who are in custody are sent to another location downtown, called the Twin Tower Jail Facility. At that point, when I realized there had been an error, Ms. Fuentes was not in the building in which we reside, [f] I contacted my clerk. My first question was, I made a mistake. We need to do something about this. I said, [f]ind out what the status is of the case. She then advised me, to my surprise, that the defendant had not been released. The reason I say it was a surprise to me was because in Los Angeles on misdemeanor cases, especially infractions, if an individual has bail of under $26,000 they are automatically released. It’s just how—because the jails are overcrowded. [][] In her particular case, the bail amounts were incorrectly set. So in my mind, given when I sentence someone to 30 days in jail, usually they are out the next day. So in my mind, she had already been released and was going to be coming back to court.
“JUDGE PICHON: Even though your clerk said she was still in?
“JUDGE ROSS: Well, what happened was, over the lunch hour I told her to give me the case. We went through the entire afternoon calendar, which took some time. Then I said, [fjind out what happened in this case. [][] So at the end of the day I said to her, okay, what’s the status? And she said, well, she’s still in custody. My response was, oh, we have to get her out because she shouldn’t be in there and I clearly erred. H] What then happened was, my clerk indicated that she called the other courtroom. Because my mindset was she should have been sent to what’s called Division 61. Division 61 is the arraignment court, [f] Now, handling these traffic matters, typically, if one went to trial it went to Division 67.1 knew that. All my cases, when they had trials, went to Division 67. [][] If you look at the documentation that I provided, I wrote down Division 61, with the understanding that she would immediately go to that courtroom. And then once she would be arraigned— and, again, knowing that my actions now were wrong, but at the time thinking that that would happen, she would be released and then she would come back to court. And I relied on that because just a week prior—
“JUSTICE McCONNELL: The question is, why didn’t you order her released immediately, when you found out she was still in custody?
“JUDGE ROSS: Because at that point we couldn’t find her. We didn’t know where she was in terms of being in the system, [f] So the next day when—this happened on Monday. Tuesday afternoon—
“JUDGE HORN: I’m sorry. You say you couldn’t find her?
“JUDGE ROSS: That’s what I’m getting ready to explain.
*CJP Supp. 98 “JUDGE HORN: I don’t know what you mean by that.
“JUDGE ROSS: Okay. The incident happened on Monday. Tuesday afternoon is when I indicated we need to have her removed. [][] When the clerk, based on her representation to me, contacted the jail facility, they didn’t have a record of her, based on what my clerk told me.
“JUSTICE McCONNELL: How would the clerk then know she was still in jail?
“JUDGE ROSS: Because it had not showed any type of release. Although, it had indicated that she was still in custody, but for whatever reason she could not be found.
“JUDGE HORN: Doesn’t your bailiff usually do this? Doesn’t the bailiff usually handle those issues?
“JUDGE ROSS: In this particular instance for me, I typically will rely on my clerk. If it’s something that’s not worked out, if I need to go tp a bailiff, I will do so. [f] But it had been my experience that in relying on my clerk that things would be handled properly. Which is why I still work with her. [][] That takes us to, now, Wednesday.
“JUSTICE McCONNELL: No, but she found out that this person was still in jail and you couldn’t just order her released?
“JUDGE ROSS: The issue at that point was, she had not been released. They were not clear as to whether or not she had posted bail or not.
“JUSTICE McCONNELL: You just told us they couldn’t find her.
“JUDGE ROSS: Right. And that was one of the reasons. Because they didn’t know, had she been released? Was she just lost in the system? There was no knowledge of that, [f] So then Wednesday morning we said, okay, what is the status of this case? My clerk advised me the reason why they can’t find her was because she had posted bail, and so she was no longer in custody. And that’s why they couldn’t locate her. And as it turned out, she had, in fact, posted bail.
“JUDGE HORN: Wasn’t that three days later?
“JUDGE ROSS: No, that was two days later, [f] So at that point I said, okay, it’s horrible that she ended up spending these two days in custody. I know that she’s now out of custody. The only thing that I can do at this point *CJP Supp. 99 is to notify the others that when her case comes back it should be dismissed, that I erred, I know I erred, I have no explanation as to what I was thinking at the time, and I won’t make any excuses for it. But that was the scenario of the events.”
The foregoing reflects Judge Ross’s inability or refusal to confront the reality of his wrongdoing and the seeming ease with which he makes things up. Alternatively, or additionally, it demonstrates he is intentionally trying to mislead the commission. When Judge Ross reported himself to Judge Sotelo on April 24—three days after he incarcerated Ms. Fuentes—he still thought his mistake was to have charged her with submitting false insurance evidence. He still did not realize the gravity of his error in usurping the prosecutor’s function. The claims of what he did, or assumed, during the days Ms. Fuentes was behind bars are concoctions. As the masters stated, “Judge Ross’s claim that he took immediate steps to rectify his error is belied by the record . . . .”
Although the masters disbelieved and discredited all of Judge Ross’s stories related to the Fuentes matter, he persists. Whatever the basis for his tales, Judge Ross’s lack of candor before the masters and this commission is apparent. He concluded the quoted exchange with the three judge commission members with the statement, “I know I erred, I have no explanation as to what I was thinking at the time, and I won’t make any excuses for it.” Nonetheless, Judge Ross made a number of unconvincing excuses that are clear and convincing evidence of his efforts to mislead the masters and this commission.
2. Conclusions of Law
We agree with the masters that Judge Ross’s actions in connection with the Fuentes matter constitute willful misconduct. The three elements of that most serious form of misconduct, specified in Broadman, supra, 18 Cal.4th at page 1091, are present here. There is (1) unjudicial conduct that is (2) committed in bad faith (3) by Judge Ross acting in his judicial capacity.
The masters concluded, as do we, that Judge Ross violated California Code of Judicial Ethics canons 1 and 2A (all further references to a canon are to the California Code of Judicial Ethics) (by creating an appearance of impropriety and undermining the integrity and independence of the judiciary), canon 3B(4) (by failing to be patient, dignified and courteous to persons with whom the judge deals in his or her official capacity), canon 3B(7) (by failing to afford litigant full right to be heard) and 3B(8) (by failing to dispose of all matters fairly). His conduct therefore was unjudicial under the Broadman test. (Accord, Dodds, supra, 12 Cal.4th at p. 172; Oberholzer, supra, 20 Cal.4th at *CJP Supp. 100 p. 395.) “ ‘The failure of a judge to comply with the canons “suggests performance below the minimum level necessary to maintain public confidence in the administration of justice.” ’ ” (Adams II, supra, 10 Cal.4th at p. 878, citing Adams v. Commission on Judicial Performance (1994) 8 Cal.4th 630, 662 [34 Cal.Rptr.2d 641, 882 P.2d 358].)
Judge Ross was acting in his judicial capacity. He also acted in bad faith because he acted out of pique, irritation or impatience, any of which is a purpose other than the faithful discharge of his judicial duties. Alternatively or additionally, he acted beyond his lawful authority, either with knowledge that it was beyond his authority or with a conscious disregard for the limits of his authority.
The judge clearly lacked authority to add new criminal charges against Ms. Fuentes. In doing so, he intruded into the charging authority of the prosecutor, became embroiled, and deprived the defendant of an impartial judge. (Cf. Fletcher, supra, 19 Cal.4th at pp. 907-910 [willful misconduct for judge to have ordered district attorney to add new charges]; Ryan, supra, 45 Cal.3d at pp. 535-536 [willful misconduct for judge to have urged district attorney, ex parte, to pursue felony, not misdemeanor, charges].)
Judge Ross testified “it was clear” that he should not have added charges, and he admitted he “should have known that, having been a former prosecutor myself.” He then added, “having been a former prosecutor, I knew that that authority rested with the prosecutorial agency.” However, he reverted to the following: “And I had been on the bench long enough to where, in that particular instance, I should have known that that was something that I should not have done.” When asked to clarify between the two “should have known” assertions and the clear statement “I knew,” Judge Ross declined to respond, stating instead, “I’m very comfortable with the answer that I already indicated.”
The judge’s unwillingness to clarify whether he in fact knew manifests a consciousness of wrongdoing. Further, his experience as an eight-year veteran prosecutor, and his experience on the criminal bench at the time of the Fuentes matter, combine to convince us he in fact knew he lacked the authority to add charges. By a parity of reasoning, we also are convinced he knew he lacked the authority to incarcerate the defendant summarily, without any pretense of due process, based on the faulty new charges.
In Kloepfer, the judge also had substantial prebench experience as a prosecutor (11 years), from which the Supreme Court deduced that he was “well acquainted with the constitutional and procedural rights of criminal defendants.” {Kloepfer, supra, 49 Cal.3d at p. 865.) Judge Kloepfer’s failure *CJP Supp. 101 to use his knowledge and experience to ensure the rights of persons appearing before him suggested an improper motive, according to the court. (Id. at pp. 865-866.) We likewise conclude that Judge Ross’s failure to use his knowledge suggests that he violated Ms. Fuentes’s rights for an improper motive. He acted in bad faith.
We are fortified in the conviction that Judge Ross acted in bad faith in the Fuentes matter by the fact that there is equally clear evidence of malicious intent—bad faith—in two of the other counts. In both the Aka case (discussed post, pp. 110-112) and the Salcido matter (post, pp. 112-118), Judge Ross trampled on the defendants’ rights also while angry or vexed. His knowing disregard of fundamental rights and abuse of judicial authority in Fuentes was not an aberration, but rather, part of a pattern that renders Judge Ross unsuited for the bench.
B. COUNT 1A—PEOPLE V LENORE CARRILLO
1. Findings of Fact and Conclusions of Law Concerning Basic Charges
The defendant, a long-term heroin user who was seven months pregnant, appeared before Judge Ross on Thursday, August 23, 2001, on three drug charges in one of the earliest cases brought under new laws enacted under Proposition 36.[4] As a condition of probation, Ms. Carrillo was ordered to report for an assessment at the Community Assessment Service Center (CASC) the next day, Friday, August 24, and to return to court the following Wednesday, August 29. She failed to appear on either occasion. Judge Ross concedes he called and spoke with the defendant on the telephone. The commission charges that the telephone communication violated canon 3B(7) which, generally speaking, and as applicable here, prohibits ex parte communications.
The parties dispute the timing and circumstances of the judge’s call to the defendant. The masters accepted Judge Ross’s basic version of the events. According to the judge, the defendant called the court and left a voice message on a recording system, crying and sounding desperate because she had failed to return to court on August 29 as ordered, and requesting that someone call her. Judge Ross testified that he was working late on August 30, heard the message, and returned the call around 5:30 or 6:00 p.m. that evening.
*CJP Supp. 102 We decline to adopt Judge Ross’s version because, as will be discussed, he created a self-serving after-the-fact record of his call that he misrepresented to the commission as having been contemporaneously created. This subsequent action is described more fully (post, pp. 104-109), and at a minimum, casts doubt on his claim of what happened.
The timing and circumstances of the call are not critical in terms of analyzing the basic impropriety of the ex parte contact with the defendant. The significant fact is that the masters find, and the judge admits, that he had a private telephone conversation with the defendant in a case then pending before him. We adopt this basic finding. The masters concluded the call was in violation of canon 3B(7), and we concur in that as well.
The commission charges that Judge Ross’s ex parte communication also created an appearance of impropriety and undermined the integrity and independence of the judiciary in violation of canons 1 and 2A. The masters rejected this further charge based on the finding that in the setting of a Proposition 36 case, members of the public would approve of a judge being sufficiently concerned about this particular defendant’s welfare to make such a call. Based on that reasoning, they concluded that the public would not question the judge’s integrity or impartiality because of the telephone contact. Continuing with the analysis, the masters concluded that the phone conversation constituted improper action, not prejudicial misconduct, because an element of the latter is the adverse effect on public esteem for the judiciary that is missing here.
We adopt the masters’ analyses and conclusion, and agree that in the unique setting of this early Proposition 36 case, the telephone contact with the defendant constituted improper action, for the reasons described.
2. Findings of Fact and Conclusions of Law Concerning Judge Ross’s Defenses and Subsequent Actions
a. Judge Ross’s Claimed “Emergency” Under Canon 3B(7)(d): Judge Ross asserted before the masters that his ex parte telephone conversation did not violate canon 3B(7) because the situation fell within the exception of subdivision (d) of that canon, allowing ex parte communication “where circumstances require” because of an “emergenc[y].”[5] The masters rejected *CJP Supp. 103 the judge’s argument on two grounds—that there was no “emergency” within the meaning of the exception, and that the judge failed to promptly notify the parties of the substance of the conversation, an additional requirement for the exception to be available under subdivision (d).
(1) Lack of Emergency: We adopt the masters’ finding that the record does not support the judge’s claim that the alleged voice mail message triggered an emergency within the meaning of subdivision (d) of canon 3B(7). According to Judge Ross’s description of the recording, the defendant was upset and frightened because she failed to return to court. That does not suggest an emergency. Further, and again according to the judge’s version of his call, he merely told Ms. Carrillo to come to court the next day to deal with the issues. That instruction also does not suggest any emergency.
(2) Failure to Promptly Notify the Parties: We also adopt the masters’ finding that Judge Ross did not “promptly notify the parties.” Judge Ross claimed that he told both the prosecutor and defense counsel of the phone call on August 31—the day after he claims he returned the voice mail message. However, he made no contemporaneous record of the call and there is no evidence both counsel were in his courtroom that day.
Further, both counsel testified that they first learned of the call later. Defense counsel, deputy alternate public defender (DAPD) Charlean Hartsfield, testified that Judge Ross first told her about the call in early October 2001. The prosecutor, Deputy City Attorney Bryan Bowers, has no recollection of knowing of the call until he was contacted by an investigator for the commission.
The masters stated they were “not persuaded Judge Ross accurately recalled when he made this disclosure.” Nonetheless, Judge Ross persists in asserting that he gave prompt notice to counsel even though the evidence belies the claim. In both his opening brief and in “Respondent’s Response” brief, he repeats the discredited claim of prompt notice, with no new argument or supporting evidence.
In “Respondent’s Reply” brief, Judge Ross resorts to out-of-context excerpts from the testimony of the defendant’s counsel in a misleading attempt to buttress his argument that he gave prompt notice. In fact, the two excerpts directly contradict the judge’s claim. In the first quotation from DAPD Hartsfield, she testified that her client, not Judge Ross, told her of the judge’s *CJP Supp. 104 call. In the second quote, DAPD Hartsfield is repeating something the judge said earlier—“You know I called Ms. Carrillo at home”—to which Hartsfield testified she responded, “Yes, I know because she had'told me.” (Italics added.) Thus, in this second excerpt, it was again the client, not the judge, who had told Ms. Hartsfield of the call.
We determine that Judge Ross’s claim that he promptly notified counsel of his ex parte telephone contact with the defendant is false.
Judge Ross makes two additional assertions that again demonstrate his penchant for blaming others to divert attention from his own wrongdoing. First, he criticizes DAPD Hartsfield because she delayed disclosing the ex parte communication “to any court officials” until October 2001. The pertinent inquiry is whether Judge Ross had an improper ex parte communication, not whether or when DAPD Hartsfield notified court officials of it.
Second, DAPD Hartsfield did report Judge Ross’s ex parte telephone call to Commissioner Jeffrey Harkavy, the acting site judge of the facility where Judge Ross was assigned, who promptly ordered the Carrillo case transferred to his own department. Judge Ross attempts to deflect responsibility for his own misconduct by complaining that Commissioner Harkavy thereby had an improper ex parte conversation with Hartsfield. The judge also criticizes Commissioner Harkavy, using strident language, for transferring the case from Judge Ross. Judge Ross also suggests something nefarious on the part of the examiner in not calling Commissioner Harkavy as a witness. The subject of this inquiry is Judge Ross, not others.[6]
b. Judge Ross’s Alteration of the Record to Buttress His Version of Telephone Call: Judge Ross also altered a court docket sheet in an attempt to buttress his defense. He then used that altered document, first, to attempt to mislead his supervising judges so they would not report his ex parte communication to this commission. Then, after charges were filed against him by the commission, Judge Ross relied on the same altered document as the basis for a false defense he asserted under oath in his answer to the charges. The developments unfolded as follows:
(1) Judge Ross Learns That Defense Counsel Knows of Ex Parte Conversation; Counsel Reports It: As mentioned, several weeks after the ex parte telephone conversation, Judge Ross learned that the defendant’s attorney, *CJP Supp. 105 DAPD Hartsfield, knew about it. DAPD Hartsfield met with Judge Ross in his chambers on or about October 4, 2001, to discuss the fact that she had begun to file selective peremptory challenges (Code Civ. Proc., § 170.6) to disqualify him from her cases. During that meeting, Hartsfield acknowledged that Ms. Carrillo had told her of the judge’s phone call. According to a memo dated that same day by Commissioner Harkavy, DAPD Hartsfield reported the phone call to him (the commissioner) on October 4; he in turn reported it to Judge Dan Oki, the supervising judge of the criminal law division of the Los Angeles County Superior Court.
(2) Judge Ross Learns That Defendant’s Version of Call Differs from His: By November 8, 2001, word of the ex parte contact had reached Presiding Judge James A. Bascue, who, in a memo on that date, directed Judge Oki to investigate and report back to him. Judge Ross testified that he was contacted by Judge Oki on November 8, and met with him the following day, November 9. Assistant Supervising Judge C.H. Rehm also attended the meeting.
Judge Oki prepared a memorandum on November 9 memorializing the meeting. Judge Ross agreed at oral argument before the commission that Judge Oki’s memo was a fair summary of the meeting. According to Judge Oki’s memo, the following transpired when the three judges met:
Judge Ross described the telephone call to his supervising judges basically as he describes it in these proceedings, namely, that he responded to the defendant’s voice mail message after she had called the court because she had missed a court date. Judge Ross also told his supervising judges that he told Ms. Carrillo to return to court, but that she never reappeared.
Judge Oki responded to Judge Ross at the meeting that the defendant’s version differed from Judge Ross’s in that she claimed the judge called her at her father’s house in the early evening of August 23—the same day as the initial Proposition 36 hearing—and not on August 30. According to Judge Oki’s memo, Judge Ross denied to Judges Oki and Rehm that he initiated the first call.
Apart from the discrepancy concerning who initiated the call, the timing of it is crucial to the judge’s version of the events. If one were to accept Ms. Carrillo’s version that the judge called her on the 23rd, the conversation would have occurred before she was due to report to the CASC on the 24th, and before she was due back in court on the 29th. Thus, there would have been no basis for her to have called the court upset and crying; she would not yet have failed to satisfy the terms of probation. Judge Ross’s claim concerning the alleged voice mail message thereby would have been exposed as false.
*CJP Supp. 106 Continuing, Judge Oki wrote in his memo as follows: “I asked [Judge Ross] to review the files, check the dates, and reconstruct what happened as accurately as he could in a letter to me by November 16 which could be forwarded to Judge Bascue. I indicated that if what he represented is accurate, I would be inclined to recommend to Judge Bascue that the incident not be reported to the [Commission on Judicial Performance].”
(3) Judge Ross Creates After-the-fact Notes of Telephone Call: On November 9, the same day as the judges’ meeting, three sets of computer-generated records of court minutes—one for each of the three pending Carrillo cases—were printed. During oral argument before the commission, Judge Ross denied that he had printed out the minutes and denied knowing who had done so. Judge Ross admits, though, that he made handwritten notes on one of the printouts of the minutes for August 29, 2001. In the handwritten notes, Judge Ross wrote: “Case Wednesday & BW [bench warrant] called Thursday & said she’d be in on Friday & never showed.” The computer-generated records, including the page on which Judge Ross wrote, show that they were printed on November 9, 2001.
The import and meaning of the notes is clear: they buttress the judge’s version of what he claims occurred back in August. “Case Wednesday” refers to the date, Wednesday, August 29, that Carrillo was ordered to return to court; upon her failure to do so, a bench warrant issued. Judge Ross allegedly then “called [her on] Thursday,” and she “said she’d be in on Friday,” the next day, “& never showed.”[7]
Judge Ross’s motivation to make the notes is equally clear. He had just learned on November 9 that his supervising judges knew of the ex parte call. At that time, he also learned that the defendant claimed that Judge Ross made the first call—that is, that she disputed that he was responding to any message from her—and that she placed the timing of the call a week earlier than he claimed. His immediate supervising judge, Judge Oki, had directed Judge Ross to reconstruct what happened, and told him that if he, Judge Oki, was convinced by Judge Ross’s version of the events, he was “inclined to recommend” to the presiding judge that the matter not be reported to this commission.[8] Judge Ross had a clear and strong incentive to fortify his version of the events.
*CJP Supp. 107 Judge Ross stated at oral argument before the commission that “someone” gave him the November 9 computer printouts. He confirmed, however, that he added the notes and gave them to Judge Oki along with a letter dated November 15. The letter contained Judge Ross’s version of the events, pursuant to Judge Oki’s instructions from the November 9 meeting. In other words, Judge Ross buttressed his explanation to Judge Oki by including his altered docket record. That altered version of the court record bearing Judge Ross’s notes is part of the official court file.
(4) Judge Ross Files False Answer to Commission Charges Based on the Altered Record: On September 17, 2004, Judge Ross signed his verified answer to the commission’s charges against him, and the answer was filed with the commission on September 20, 2004. In it, the judge purports to describe the proceedings in the Carrillo matter on Friday, August 31; according to his chronology, this would have been the day after his phone call. He states in the answer that “the court was anticipating defendant Carrillo’s presence.”
Continuing, Judge Ross states as follows: “Ms. Carrillo, however, never reappeared in court on her own volition. Because the bench warrants had already issued, nothing additional was noted or transcribed that day on the record. Respondent, however, jotted down in the court’s minute order for future reference what had actually occurred concerning the telephone call and Ms. Carrillo’s actions. After adjourning that day, Respondent had no further contact with the defendant.”
The clear inference in the foregoing sworn statement is that Judge Ross “jotted down” the notes at issue contemporaneously with the August 31 hearing. The reference to the note-making is immediately preceded and followed in the quoted text by descriptions of events of “that day,” August 31.
Quite obviously, Judge Ross did not realize, either when he made the notes or when he filed his verified answer, that he had written on a document that showed it was not printed until November 9. By the time of the masters’ hearing, however, the judge had received the commission’s discovery documents (containing the annotated Nov. 9 printout) and the examiner’s prehearing brief. In the brief, the examiner demonstrated the impossibility that the judge made the notes in August, given the November print date of the document on which the judge had written them. Accordingly, during his testimony before the masters, Judge Ross was constrained to concede that it was impossible for him to have made the notes contemporaneously with the events in August.
*CJP Supp. 108 Judge Ross’s verified answer was false in a material respect and we conclude it was knowingly false. By his own testimonial admission, it was not until after signing and filing his answer that he realized he was trapped by the print date on the computer printout. He knew the notes were not contemporaneous, but he did not realize there was irrefutable evidence of the after-the-fact alteration, and of his sworn misrepresentation built on the altered court record.
(5) Judge Ross’s Subsequent Assertions Concerning His Conduct: Even after being confronted with his deception, Judge Ross has continued to search for ways to avoid responsibility.
First, as noted, Judge Ross conceded before the masters that his answer could not be correct, given the recorded computer print date. Prior to that full admission, however, he attempted to dodge the issue, at least partially, in the following exchange with the examiner before the masters concerning his annotation on the printout:
“Q. When did you make that note?
“A. I made the representation in my verified answer that my memory was that I had made it in August of 2001. When I read the information, as well as your pre-examiner’s [sic] brief and you pointed out ‘you couldn’t have done it then, because this document wasn’t printed until November 9,’ then I had to stop and go, okay, I guess I didn’t do it on August 31st. . . .”
There was, in fact, no qualification in his verified answer that the judge’s memory was that he made the notes contemporaneously in August. Rather, there was a carefully written statement that the notes were contemporaneous, with no qualification whatsoever.
Second, in Judge Ross’s reply brief, he refers to his note on the computer printout, and to his answer as follows: “Respondent admitted to returning Carrillo’s phone call when she initially contacted the court by voicemail after warrants were issued on her three cases. If the Special Masters found these facts to be true and the examiner is now conceding the truthfulness of the statement, then the notation made in November 2001 inside the court file accurately reflects the circumstances that occurred.”
We reject this explanation. The assertion skirts the obvious—that the alteration was made for the improper purpose of trying to short-circuit a report to this commission; the judge’s answer then compounded the deception. Further, the examiner did not concede the truthfulness of the judge’s *CJP Supp. 109 claim. In the examiner’s opening brief (BOB), he stated only that he did not object to the masters’ findings and conclusions regarding the Carrillo matter.
Finally, when asked during oral argument before the commission about his verified answer as respects the timing of the notes, the judge responded to questioning by the chairperson as follows:
“COMMISSIONER GROSSMAN: Why did you represent in your defense before this commission that you made these notes contemporaneously with the events back in late August 2001?
“JUDGE ROSS: The reason that I initially made that representation was because I recall that I didn’t have any particular notes about that event, but it was very vivid in my mind. And so when I actually saw the documents from the examiner, that was really the first time that I had seen that document. And this would have occurred in 2004.
“COMMISSIONER GROSSMAN: You mean the first time since you wrote on the document?
“JUDGE ROSS: Right. So we’re talking about three years later, and I’m looking at documents, [f] And I have a very clear memory of what took place with respect to Mr. [szc] Carrillo. So when I saw that document from the examiner, it appeared to me, oh, I guess I actually did write a note indicating what took place. [j[] When the examiner then pointed out that it was stamped November 9, 2001, and so it would not have been possible for me to have actually recorded that, in my subsequent answer I acknowledged that.
“COMMISSIONER GROSSMAN: You had no choice.
“JUDGE ROSS: I could have said, no, that’s incorrect. I mean, yes, I had a choice. And my choice was to say, yes, this could not have happened prior to November the 9th.
“COMMISSIONER GROSSMAN: Thank you____”
In this exchange, Judge Ross’s evasiveness is apparent and troublesome. His concluding remark also is telling. “I could have said, no, that’s incorrect.” We understand this to be an assertion, in the face of proof that his notes could not have been contemporaneous, that he still had a choice to assert the contrary, that is, he could have lied. Catching himself, he switched position, and conceded, in effect, that his answer was false. He never explained why he made a materially false representation to the commission.
*CJP Supp. 110 C. COUNT IB—PEOPLE V. WILFRED AKA
1. Findings of Fact
The relevant proceedings before Judge Ross in the Aka case were recorded and the facts are not in dispute. We adopt the findings of the masters, which we summarize.
Mr. Aka was charged in October 2001 with zoning and other violations in connection with holding religious services in his home. He entered into a diversion agreement with the city attorney (the prosecutor in the case) for dismissal of the case if Mr. Aka moved the services elsewhere.
On September 26, 2002, Judge Ross presided over the case for the first time; the purpose of the hearing was a “progress report.” Mr. Aka had not been arraigned, and appeared without counsel. The deputy city attorney (DCA) announced at the outset that Mr. Aka had not complied with the diversion agreement; the DCA said he wanted to proceed with the criminal charges. The DCA told Judge Ross that neighbors had signed petitions against Mr. Aka; he asked that Judge Ross enter a plea, schedule a trial, and issue a “cease and desist” order—in effect, a temporary restraining order to prohibit Mr. Aka from holding services pending trial.
Judge Ross informed Mr. Aka of his right to legal representation, to which Aka responded directly, “I would need to seek legal representation.,‘‘ (Original italics.) Notwithstanding the defendant’s unambiguous request for counsel, Judge Ross immediately asked Mr. Aka questions bearing on the requested restraining order. Many of the defendant’s neighbors were in court and loudly disagreed when Mr. Aka stated that only 20 to 25 people attended services. Noting the spectators’ vocal reactions, Judge Ross said to Mr. Aka: “Well, we’ve got a choir over here that’s disagreeing with you. Let the church say Amen, okay?” After suggesting that someone—either Mr. Aka or the neighbors were “not telling ... the truth”—Judge Ross told Mr. Aka to “be straight” with him.
Continuing, Judge Ross told Mr. Aka—in the presence of the neighbors in the courtroom—that if the neighbors took pictures that came into evidence, Mr. Aka would be in a “bad” position, perhaps facing jail time and civil liability. The DCA then handed the judge photographs of Mr. Aka’s home, showing an altar and 12 benches. After viewing the photos, Judge Ross began accusing Mr. Aka of lying to him. The judge continued to press the defendant, and continued to accuse him further of lying, until Mr. Aka admitted that as many as 60 people had come to his house, and that he “officiated” at services. After having obtained these incriminating admissions, *CJP Supp. 111 Judge Ross entered a not guilty plea on Mr. Aka’s behalf and then told Mr. Aka that he needed to get a lawyer.
2. Conclusions of Law
The masters concluded that Judge Ross’s conduct at the September 26 hearing was in violation of canons 1 and 2A (by creating an appearance of impropriety and undermining the integrity and independence of the judiciary), 3B(4) (by failing to be patient, dignified and courteous) and 3B(8) (by failing to dispose of the matter fairly). They also concluded Judge Ross became embroiled in the controversy, abandoned his role as an independent arbiter, and exceeded his judicial authority through deliberate violations of the defendant’s constitutional rights to counsel and against self-incrimination. The masters rejected Judge Ross’s proffered defenses, and determined he committed prejudicial misconduct. We concur in all of the foregoing except we determine that the wrongdoing constitutes willful misconduct.
Given the canon violations, the conduct was unjudicial under the threefold Broadman test. It is also clear that Judge Ross was acting in his judicial capacity. On the third issue—bad faith—we find that Judge Ross intentionally violated Mr. Aka’s constitutional rights. No other conclusion is reasonable based on the sequence of events: (1) Judge Ross told Mr. Aka “it may be in your best interest to secure legal representation .... You have by law the right to do that or you can represent yourself. What would you like to do, sir?” (Italics added.) (2) Mr. Aka responded directly, “/ would need to seek legal representation.” (Italics added.) (3) Judge Ross ignored Mr. Aka’s invocation of that constitutional right, and further violated the defendant’s right to basic due process by his prearraignment badgering of Mr. Aka until he incriminated himself.
There can be no question that Judge Ross knew of Mr. Aka’s right to counsel; the judge advised him of the right. Additionally, given Judge Ross’s prebench and on-bench experience and practice in the area of criminal law, we entertain no doubt that Judge Ross also knew of the defendant’s right to a hearing, with counsel, and of his right against self-incrimination. We are likewise convinced the judge was aware he was abusing his authority by violating those rights through his determined extraction of incriminating admissions from the defendant in the absence of counsel; alternatively, he did not care about the limits of his authority or about Mr. Aka’s fundamental rights.
Judge Ross manifestly was swayed by the audible protests from Mr. Aka’s neighbors in the courtroom. Prodded on by that spectator reaction, the judge sided with the neighbors, became annoyed with Mr. Aka and chastised him *CJP Supp. 112 for not being “straight” with him, and then progressed to the repeated accusations that the defendant was a liar. The embroilment and lack of impartiality are clear.
As in Kloepfer, supra, 49 Cal.3d at pages 865-866, Judge Ross’s failure to use his knowledge and experience to ensure Mr. Aka’s rights suggests an improper motive. We conclude there was manifest embroilment, a loss of impartiality, abuse of judicial authority and resulting violation of fundamental rights, and willful misconduct.
D. COUNT 1C —PEOPLE V. HECTOR SALCIDO
1. Findings of Fact Concerning Basic Charges
There is general agreement concerning the basic facts of the relevant proceedings before Judge Ross in the Salcido case. We adopt and summarize the masters’ findings.
Mr. Salcido was placed on probation by Judge Ross on September 30, 2002, in connection with three domestic violence offenses; the defendant admitted to long-term drug abuse problems but indicated willingness to reform. Mr. Salcido was represented at the September 30 hearing by Deputy Public Defender (DPD) Lisa Gordon. One of the conditions of probation was that the defendant was required to appear before Judge Ross on October 18 to show proof that he was attending required 12-step meetings.
When Mr. Salcido failed to appear on October 18 as ordered, a bench warrant issued. He was arrested on October 22, and brought before Judge Ross the following day, with different defense counsel, for a probation violation hearing. Mr. Salcido claimed he had not appeared on the 18th because he was in a rehabilitation facility. Judge Ross continued the hearing to permit the defendant to appear with DPD Gordon. The judge testified before the masters that he thought it was important for Ms. Gordon to appear with the defendant because of her familiarity with the case.
The continued hearing took place a week later, on October 29, with DPD Gordon appearing with Mr. Salcido. Although the issue to be determined was whether the defendant had violated the terms of probation, Judge Ross made clear that he already had determined there was a violation, given that the defendant had failed to appear on the 18th. The judge stated that he intended to sentence the defendant to 90 days in jail.
When DPD Gordon protested Judge Ross’s determination of the probation violation and announced sentence, the judge asked Mr. Salcido directly if he *CJP Supp. 113 wanted to admit the probation violation, stating, “I’ve already found him in violation . . . .” Ms. Gordon again protested and stated that her client was not admitting the violation; she demanded a hearing and the right to subpoena witnesses. Judge Ross reiterated that he had already determined the probation violation. DPD Gordon again asserted that her client had a right to a hearing, and she asked to make a record. Judge Ross refused both requests and announced he was sentencing Mr. Salcido to jail for 90 days. Witnesses describe the exchange between the judge and Ms. Gordon as having “escalated,” with both of them speaking in “raised voices,” and that Ms. Gordon was “out of control” and “disrespectful” and “out of line.”
The heated exchange culminated with Judge Ross evicting Ms. Gordon from the courtroom. Thereafter, without taking a break, the judge immediately proceeded with the sentencing of Mr. Salcido, addressing the defendant directly. At that point, another defense attorney who happened to be in the courtroom stated his name for the record. According to the transcript, this sequence of events unfolded as follows:
“MS. GORDON: May I make—I’m making a record.
“THE COURT: No. Now you need—if you need to go outside and cool off, then you need to do that, but I don’t want to hear anything else. That’s it.
“MS. GORDON: Is the court not allowing me to make a record?
“THE COURT: Deputy Robinson, take her outside. Go outside, Ms. Gordon.
“[Bailiff Robinson escorted Ms. Gordon out of the courtroom.]
“THE COURT: All right, Mr. Salcido. Regarding the 1SF015342 matter, your probation will be revoked and reinstated under the following modifications: the 12-step meetings are deleted for that matter.
“MR. BERRY: For the record, Michael Berry for the defendant since his attorney has left.
“THE COURT: That’s fine.”
Michael Berry, who stated his name for the record, was an experienced civil attorney, but was a trainee deputy public defender. He happened to be in Judge Ross’s courtroom when Judge Ross had the bailiff remove DPD Gordon. DPD Berry had not been paying attention to the Salcido proceedings, knew nothing about the pending issue, and had never reviewed the file or spoken with the defendant or anyone else about the case. When Mr. Berry *CJP Supp. 114 stated his name, he was standing by the glass enclosure for in-custody defendants at the side of the courtroom.
After Judge Ross stated “That’s fine,” he continued with the sentencing proceedings. He ignored DPD Berry and continued to address Mr. Salcido directly, questioning him about the rehabilitation center he claimed to have attended. After examining some documents provided by the defendant, Judge Ross accused the defendant of lying to him: “See you are lying to me. You keep lying. See, you are making me mad again. You are a pathological liar. You don’t get it. You don’t get it. I don’t know about—I think we are setting him up for failure. We’re setting him up for failure.” After DPD Berry interrupted to inquire “[a]re we finished?,” there were further discussions on and off the record. Judge Ross put the matter over until the afternoon.
Judge Ross met with Ms. Gordon in chambers on the afternoon of the day he had ordered her removed. The judge explained the circumstances of the meeting as follows: “The public defenders left me no choice. Because, that afternoon, they decided that they were going to boycott the court and that they wouldn’t interview anyone in custody, that they wouldn’t appear in court. ... At 4:00, there are no attorneys, none have checked in. . . .”
According to the judge, Ms. Gordon’s supervisor and a deputy city attorney also attended the afternoon meeting in chambers. Judge Ross testified that he apologized to Ms. Gordon in chambers, but told her that “she couldn’t be arguing with him in open court.” The judge said at the meeting that he needed some time to think about what he would do in the case. At a hearing the next day, Judge Ross granted DPD Gordon’s request for a formal probation violation hearing, at which she could present evidence to substantiate Mr. Salcido’s claim he was in a residential program when he failed to appear on October 18.
Ultimately, on November 5, 2002, Mr. Salcido appeared with DPD Gordon and admitted the probation violation. Judge Ross revoked and then reinstated probation and stayed jail time.
2. Findings of Fact Concerning Judge Ross’s Defenses
The judge claimed before the masters, and continues to assert in his briefs to the commission, that he committed no wrongdoing in his handling of the Salcido matter. We, like the masters, reject his claims.
a. Judge Ross’s Claim That the October 29 Hearing Was a Formal Probation Violation Hearing: The underlying disagreement between Judge Ross and DPD Gordon was whether the hearing on October 29 was a formal *CJP Supp. 115 probation violation hearing, where the parties would be expected to put on evidence of whether there was a violation, or whether it was an informal proceeding, more akin to a pretrial conference. The argument Ms. Gordon was pressing was that her client did not admit the probation violation and that she wanted a formal hearing at which to present evidence. Because the client refused to admit the violation, formal proceedings were required by law. (See In re Wagner (2005) 127 Cal.App.4th 138, 146 [25 Cal.Rptr.3d 201].)
Judge Ross testified before the masters that the subject hearing was a formal one, claiming that all probation hearings in his court were formal. The masters rejected the judge’s latter claim, finding it “inconsistent” with the clear evidence that the “long-established” procedure followed by judges in Los Angeles—including Judge Ross personally—was that the initial probation violation hearing would be an informal pretrial conference. We agree with the masters’ assessment of the evidence.
Judge Ross’s assertion that all probation hearings in his court were formal is knowingly false. We, like the masters, are convinced from the evidence that the judge knew that all probation violation hearings in his court were not formal ones.
As a subtheme of the judge’s assertion the hearing was a formal one, he casts blame on DPD Gordon because she allegedly should have been prepared to present evidence at the October 29 hearing. Since she “should have been ready,” her insistence on a later hearing was a disguised motion for a continuance, according to the judge. We agree with the masters’ rejection of the claim. As they correctly note, the judge’s assertion is invalid because of the following: “[It] ignores the defendant’s absolute right to a hearing, the prosecution’s obligation to present evidence of the defendant’s probation violations, the accused’s right to challenge that evidence, and the deputy city attorney’s acknowledgement he was not prepared to present evidence of Salcido’s probation violation. (R.T. 641.) (See Morrissey v. Brewer (1972) 408 U.S. 471, 487-488 [33 L.Ed.2d 484, 92 S.Ct. 2593]; People v. Vickers (1972) 8 Cal.3d 451, 457-458 [105 Cal.Rptr. 305, 503 P.2d 1313]; In re Wagner[, supra,] 127 Cal.App.4th 138, 146.)”
Judge Ross again uses a scapegoat—in this instance, unjustifiably blaming DPD Gordon for her alleged unpreparedness—in an attempt to divert focus from his own wrongdoing.
b. Judge Ross’s Justification for Proceeding After Evicting Counsel: Judge Ross contends that it was appropriate for him to continue with the hearing “with another attorney” after he ordered DPD Gordon removed. The judge claims, in effect, that he was justified in proceeding because DPD Michael *CJP Supp. 116 Berry happened to be present in the courtroom and announced his appearance in Ms. Gordon’s absence. This justification is in marked contrast to his testimony that he specifically continued the first hearing after Mr. Salcido’s arrest because it was important that DPD Gordon be present because of her familiarity with the case.
Judge Ross’s assertion that he was justified in proceeding because of DPD Berry’s presence was soundly rejected by the masters. We also reject it. As noted, even before Mr. Berry announced his presence, the judge addressed the defendant directly, announcing his sentence. Additionally, and as the masters correctly note, there is no indication that DPD Berry was prepared to adequately represent Mr. Salcido, and Judge Ross did nothing to determine that issue. In fact, DPD Berry testified that he was not prepared. Beyond that, however, the judge questioned the defendant directly on the substantive issues for which Ms. Gordon had been demanding a hearing, requiring him to answer—ignoring Ms. Gordon’s absence, Mr. Berry’s lack of preparation, and Mr. Salcido’s constitutional rights.
In response, Judge Ross now argues in a brief to the commission that he was justified in proceeding in DPD Berry’s presence because Berry did not say that he was not prepared to represent the defendant. This time Berry is the scapegoat; because of Berry’s silence Judge Ross proceeded to deny the defendant’s constitutional rights. However, the judge has no one to blame for his own actions before Mr. Benry announced his presence.
Judge Ross also contends that when Berry announced his appearance, Berry thereby demonstrated “Berry was aware that [Judge Ross] saw him as being Salcido’s legal representative for the limited purpose of imposing sentence.” (Italics added.) The judge claims that when he said “That’s fine,” in response to Berry’s stating his name for the record, the judge thereby was “acknowledging [the] understanding” that both of them were clear that Judge Ross viewed Berry as representing Salcido. The convoluted explanation is unreasonable and, in any event, Judge Ross’s actions belie that either he or Mr. Berry understood Berry to have replaced Gordon or to have been in a position to provide effective representation of Mr. Salcido. The judge ignored DPD Berry and proceeded to examine the defendant directly.
3. Conclusions of Law
The masters concluded that Judge Ross violated canons 1 and 2A (by creating an appearance of impropriety and undermining the integrity and independence of the judiciary), 3B(4) (by failing to be patient, dignified and courteous), 3B(7) (by failing to afford the defendant a full right to be heard) and 3B(8) (by failing to dispose of the matter fairly). The judge became *CJP Supp. 117 angry, accusing the defendant of being a pathological liar; he demonstrated embroilment and a lack of impartiality and failed to act as a neutral arbiter, according to the masters. We concur in all of the foregoing and adopt the masters’ foregoing conclusions as our own.
The masters also concluded that Judge Ross caused serious infringements of the defendant’s constitutional rights to due process by denying him the opportunity for a hearing and the right to present evidence, and by proceeding with the hearing in the absence of his counsel. They concluded that the judge properly had Ms. Gordon removed from the courtroom; the record showed that she was loud and discourteous. We adopt all of these conclusions of the masters as well.
The masters concluded that Judge Ross committed prejudicial misconduct in his mishandling of the Salcido case. We determine that Judge Ross acted in bad faith and that he committed willful misconduct. As noted in our conclusions in the Fuentes and Aka matters, and again guided by the Supreme Court in Kloepfer, we attribute to Judge Ross, based on his many years as a prosecutor and a criminal law judge, a presumptive knowledge of fimdamental constitutional rights of criminal defendants in connection with determining a probation violation.
Given the combination of Gordon’s persistent arguments that her client denied the violation and insisted on his right to a hearing, with counsel, and the judge’s presumed experience-based knowledge of those rights, we conclude that Judge Ross intentionally disregarded the defendant’s fundamental rights or knowingly acted beyond his judicial power or with a conscious disregard for the limits of his authority.
Alternatively or additionally, it appears that the judge, fresh from his heated exchanges with Ms. Gordon, directed his residual agitation or anger at her client. (See McCullough v. Commission on Judicial Performance (1989) 49 Cal.3d 186, 196 [260 Cal.Rptr. 557, 776 P.2d 259] (McCullough) [judge allowed his impatience with defense counsel to outweigh the client’s right to a fair trial and an attorney of her choice; resulting constitutional violations constituted willful misconduct].) In any case, directly after removing the lawyer, the judge turned to abusing Mr. Salcido and denying his rights, angrily calling him a pathological liar. This embroilment is evidence of anger, pique, revenge or other improper purpose. Judge Ross’s alarming violation of Mr. Salcido’s rights clearly evinces a judge motivated by an improper purpose. There was bad faith and willful misconduct.
The masters found Judge Ross’s wrongdoing was mitigated by the fact that he, “on his own initiative, quickly vacated his rulings, eliminating *CJP Supp. 118 any prejudice to Salcido.” We respectfully disagree for a number of reasons. Primarily, there can be no mitigation for maliciously motivated unjudicial conduct. (Kloepfer, supra, 49 Cal.3d at p. 865, citing Gonzalez v. Commission on Judicial Performance (1983) 33 Cal.3d 359, 377 [188 Cal.Rptr. 880, 657 P.2d 372]; accord, Spruance, supra, 13 Cal.3d at p. 800.)
It is true that Judge Ross relented and scheduled a formal probation violation hearing following the boycott of his courtroom. However, it does not follow that the defendant thereby suffered no prejudice. Judge Ross became angry and humiliated Mr. Salcido by calling him a pathological liar in open court. This unjudicial behavior manifested embroilment and had the further prejudicial effect of depriving Mr. Salcido of an impartial judge. None of these prejudices to the defendant was undone by the subsequent events. We see no mitigating circumstances in the foregoing.
At no time did Judge Ross give any indication that he comprehended any of his serious misconduct. Indeed, in his posthearing briefs, he still asserts he committed no misconduct in connection with his handling of the Salcido matter. These facts also militate against a conclusion there was mitigation.
IV. COUNT 2: ABSENCES FROM COURT
In count 2, the commission charges Judge Ross with misconduct in connection with two absences from court. We adopt and summarize the masters’ findings and conclusions that there was no proven ethical violation on either occasion.
A. COUNT 2A: MARCH 6 RADIO SHOW
1. Findings of Fact
On March 6, 2000, Judge Ross arrived at the Inglewood courthouse where he was assigned, and went directly across the street to the studio of radio station KJLH. The station has a public interest/community focus, serving a largely Latino and African-American audience. The topic of discussion that morning was Proposition 21 which was on the ballot for the election the following day; the measure proposed substantial changes to the juvenile court law and was opposed by the California Judges Association and a number of judges.
Judge Ross began speaking on radio KJLH about 9:10 a.m. He mentioned once or twice on the air that he had people waiting for him in his courtroom, but that he had chosen to take time away because the ballot measure posed issues of importance and would have a disproportional effect on the particular *CJP Supp. 119 listener audience. The comment about people waiting in court may have been part of a “humorous” exchange.
The judge completed his radio appearance at 9:30 and was on the bench in his courtroom approximately 10 minutes later. There were 50 or 60 matters on calendar and the courtroom was full. Given typical preliminaries, the 9:40 a.m. start time for the general calendar was not a substantial deviation from the normal morning schedule. Despite the slight delay, Judge Ross completed the calendar in a timely manner without assistance from other judges. The judge had not notified court personnel in advance of his scheduled radio appearance.
2. Conclusions of Law
The parties agree that Judge Ross’s subject appearance on KJLH constituted legitimate judicial outreach activity. The masters concluded that because Proposition 21 concerned improvement of the law, the legal system and administration of justice, the activity was permissible under canon 5D. We concur. Canons 3 and 4A require that a judge’s courtroom activities take precedence over all other activities, but the masters conclude and we agree that the slight delay in the calendar did not conflict with these canons. The fact that Judge Ross mentioned on the air that he had people waiting for him did not cause a diminution of public respect for the judiciary or cast it into disrepute. The comment was made in the context of his explanation that Proposition 21 was sufficiently important that he had prioritized it over beginning his morning calendar. Thus, there was no violation of canon 1 or 2A. There was only one incident of minor tardiness, and it does not constitute misconduct.
B. COUNT 2B: APRIL 2002 CONFERENCE
On March 20, 2002, Judge Ross submitted a request for time off to attend and serve on a panel at a conference of the California Association of Black Lawyers (CABL) in Palm Springs from Thursday, April 18 through Sunday, April 21. The two-day absence from work was requested as a court-related absence. The request was approved and coverage was arranged for another bench officer to preside over Judge Ross’s calendar while he was at the conference.
Prior to the beginning of the conference, Judge Ross learned there would be no formal conference activities until Thursday evening, and he agreed to participate that day in an economic conference sponsored by Operation HOPE, a nonprofit organization that provides “ ‘economic tools and services’ to ‘empower . . . underserved communities.’ (R.T. 295-296; exh. 45.)”
*CJP Supp. 120 On April 17, 2002, the day before his approved absence, Judge Ross sent an e-mail to the acting site judge, Commissioner Kristi Lousteau, with a subject line “CABL conference” and text confirming his absence the following two days. On the morning of April 18, Judge Ross participated on a panel at the Operation HOPE conference, and that afternoon, he taped a segment for a television program, Life & Times Tonight. (We discuss Judge Ross’s broader involvement in that program immediately following in pt. V, post.)
All of Judge Ross’s activities on April 18 concededly involved appropriate judicial outreach. While the subject line on the e-mail technically was partially inaccurate because Judge Ross knew he would not be at the CABL conference until Friday the 19th, there is no misconduct. The absence had been approved for judicial outreach activities, and courtroom coverage had been arranged. The fact that the judge participated in two different, but appropriate, judicial outreach activities on Thursday, prior to attending the specifically approved program on Friday, does not violate the canons.
V. COUNT 3: COMMENT ON PENDING CASES
The charges in this count arise out of four appearances by Judge Ross on • Life & Times Tonight, a general public affairs program produced by, and broadcast on, PBS station KCET in Los Angeles. Judge Ross is charged with making improper public comments about three pending cases, in violation of canons 1 and 2A, which prohibit a judge from creating an appearance of impropriety and undermining the integrity and independence of the judiciary, and canon 3B(9), which generally prohibits a judge from commenting publicly on pending cases. We adopt and summarize the masters’ findings.
Judge Ross has been a regular participant on numerous Life & Times Tonight programs since 1999, with encouragement by a former presiding judge of the Los Angeles Superior Court, and support from responsible persons in the court’s public information office. Numerous other judges and legal professionals have appeared with Judge Ross on the show, and the program has included a wide range of public interest topics concerning the law, the courts, and the administration of justice.
Judge Ross testified that prior to his first appearance on the show, he consulted with the judicial ethics hotline and other judges. He has been aware throughout that the judicial canons prohibited him from discussing pending cases.
We agree with the masters that Judge Ross’s participation in the program “was consistent with the strong public policy encouraging California judges to promote public awareness of the judiciary and the judicial system. (See *CJP Supp. 121 California Standards of Judicial Administration § 39.)” We also agree with them that the issue is whether, in discharging his judicial outreach activities, Judge Ross violated the canons. We now turn to that topic.
A. COUNT 3A: COMMENT ON PENDING JUVENILE CASE
1. Findings of Fact
On January 15, 2001, Judge Ross appeared on Life & Times Tonight and spoke about his new assignment to a juvenile delinquency department of the court in Compton. During the program, he discussed a specific case over which he was presiding and that was still pending; the judge had yet to announce his disposition of the matter in court. From the program transcript, the masters and we verify that the judge openly discussed the young man’s difficult family background, the nature of the current offenses and the judge’s intentions regarding disposition.
2. Conclusions of Law
We adopt the following conclusion of the masters concerning Judge Ross’s discussion of the juvenile case: “. . . Judge Ross’s remarks violate Canon 3B(9). Judge Ross discussed—in a very public forum—a case that was pending before him and one that, by law, is confidential. Canon 3B(9) prohibits a judge from commenting on pending proceedings, and specifically prohibits a judge from discussing cases—even for an educational purpose—in which the judge has ‘personally participated.’ ”
In his testimony, Judge Ross conceded that he “may have divulged too much information.” He argues, nonetheless, that because the court proceedings remained confidential, there was no ethical impropriety. The masters and we do not agree. Numerous persons familiar with the juvenile or his case likely could have recognized his identity from the public discussion of the young man’s biographical information. The disclosure violated the minor’s right to strict confidentiality. “The strong public policy of confidentiality of juvenile proceedings and records has long been recognized.” (In re Keisha T (1995) 38 Cal.App.4th 220, 231 [44 Cal.Rptr.2d 822]; see T.N.G. v. Superior Court (1971) 4 Cal.3d 767, 778 [94 Cal.Rptr. 813, 484 P.2d 981]; Foster v. Superior Court (1980) 107 Cal.App.3d 218, 228 [165 Cal.Rptr. 701].) Further, it appeared from the judge’s discussion during the program of his intended disposition of the matter that he had prejudged the case.
The judge’s assertions that his comments were directed primarily at explaining the juvenile system and the difficult issue of rehabilitation of *CJP Supp. 122 troubled youth ignore and do not overcome the impropriety of his discussion of the case specifics. The masters rejected this claim for that reason, as do we.
Alternatively, the judge contended before the masters that canon 3B(9) is unconstitutional as applied to this charge because its application causes a chilling effect on judicial speech in violation of the First Amendment. During his appearance before the commission, Judge Ross appeared to disclaim that assertion, relying instead on his claim (rejected by the masters and us) that his television comments were about general process and thus not in violation of the canon.
“JUSTICE McCONNELL: You are now claiming that you are allowed to speak out publicly about [juvenile proceedings]; is that correct?
“JUDGE ROSS: No. What I am saying is, I understand these proceedings are confidential and private. To the extent that I did not indicate who this person was by name, or where they lived, or this wasn’t a case in the news, so anybody would necessarily know who this individual was.
“I felt as though I had taken sufficient prophylactic measures to keep that juvenile’s identity from not [szc] being revealed. . . .
“JUSTICE McCONNELL: So it’s your position that you do not believe the First Amendment gives you the right to speak publicly about these confidential proceedings?
“JUDGE ROSS: No. And thank you for bringing that up. [][] My whole point was, in this particular case, based on these circumstances, I did not feel as though the canon was violated . . . .” (Italics added.)
The masters rejected the First Amendment argument, and to the extent the judge may still assert it, we reject it as well, including for the following reasons explained by the masters: The California Supreme Court has upheld the constitutionality of the limits imposed by the canons on judicial speech concerning pending cases. (Broadman, supra, 18 Cal.4th at pp. 1100-1103.)[9] As the court explained in Broadman, the compelling public interest in maintaining a judicial system that is fair and impartial, both in fact and in appearance, justifies the restriction on judicial speech to the extent it prohibits comments on pending cases. Judge Ross also acknowledges that the “state has [a] strong interest in regulating the public commentary by a judge during the pendency of a proceeding.” (Italics omitted.)
*CJP Supp. 123 Judge Ross also argued that in order for the canon’s speech restriction to be applied constitutionally, there had to be a proven nexus between the purposes of protecting the appearance and reality of a fair system, and the challenged judicial comment. The court in Broadman specifically pointed out the danger posed to the public perception of judicial impartiality when a judge makes comments indicating prejudgment of a case. This is precisely the situation we confront with Judge Ross’s public statement of his intended disposition of the pending juvenile case. Thus, there is the direct nexus that Judge Ross claims is necessary.
We are, of course, bound by the Supreme Court’s holding in Broadman. Further, the United States Supreme Court decision in Republican Party of Minn. v. White (2002) 536 U.S. 765 [153 L.Ed.2d 694, 122 S.Ct. 2528], does not affect the continued validity of the state high court’s ruling, as suggested by Judge Ross. The Republican Party case, at the Supreme Court level, involved issues of judicial candidates’ free speech under the Minnesota canons. The Supreme Court remanded the case to the Court of Appeals for the Eighth Circuit; in a deeply divided en banc decision, the circuit court recently expanded the ruling to invalidate other Minnesota canon limitations on judges’ and judicial candidates’ political association and activities. (Republican Party of Minn. v. White (8th Cir. 2005) 416 F.3d 738.) The matter now before us does not concern either candidates’ rights or issues of political association or activities.
Additionally, it is not our prerogative to decide the constitutionality of a canon promulgated by our Supreme Court (and see Cal. Const, art. Ill, § 3.5; Lockyer v. City and County of San Francisco (2004) 33 Cal.4th 1055, 1092-1095 [17 Cal.Rptr.3d 225, 95 P.3d 459] [administrative agency created by Constitution, and granted judicial or quasi-judicial authority, lacks authority to refuse to enforce statute on grounds of unconstitutionality unless appellate court has determined statute to be unconstitutional (dictum)]). Further, in our view, canon 3B(9) does serve the compelling public interest in maintaining a fair and impartial system of justice.
We adopt the masters’ reasoning and conclusion that Judge Ross committed prejudicial misconduct. He revealed confidential information on Life & Times Tonight, including that the juvenile in question was dealing drugs from a hotel room and that his mother had a drug problem. Judge Ross’s improper public revelation of his intended disposition created the appearance of prejudgment. Although the public may have thought Judge Ross appeared compassionate, his televised disclosure of confidential information and his apparent abandonment of his status as a neutral arbiter combine to undermine public confidence in the integrity and impartiality of the judiciary. He violated canons 1, 2A and 3B(9).
*CJP Supp. 124 B. COUNT 3B: COMMENT ON PENDING GHILOTTI CASE
1. Findings of Fact
People v. Superior Court (Ghilotti) (2002) 27 Cal.4th 888 [119 Cal.Rptr.2d 1, 44 P.3d 949], involved issues regarding the release of violent sexual offender Patrick Ghilotti. The case was pending before the California Supreme Court on March 4, 2002, when Judge Ross discussed it on Life & Times Tonight. (The court issued its decision on Apr. 25, 2002.) During the program on March 4, the judge discussed the general legal issues raised in the Ghilotti case; he provided neutral and public background information concerning the case and the specific issue before the court. As the masters correctly note, “these comments were likely to give the public a better understanding of the legal issues” involved in the case.
However, Judge Ross also moved beyond generalities during his appearance on the program, most notably with the following comments: “What’s interesting about this case, in Southern California, we don’t know a lot about this individual, but up north, his family is very wealthy. Ghilotti Construction Company. He married a woman who worked at the Atascadero State Hospital. He’s somewhat charismatic. They’ve been following this case, so some feel there are some political overtones to his particular case.”
The masters characterized the foregoing statements as “peripheral” in the sense of not constituting an expression on the merits of the case. They also observed that Judge Ross did not advocate a particular outcome and that the remarks were not likely to interfere with a fair hearing on the case. We concur.
Nonetheless, we determine that the comments cannot be squared with the language or purpose of canon 3B(9). The statements about the defendant’s wealthy family, his charisma, and the suggestion that the case “is being watched” by some who felt it might have political overtones, all combine to suggest that the case had significance beyond the legal issues. Judge Rothman sums up the policy considerations that make such comments improper: “In regard to public comment on cases pending in another court, judges must avoid the unseemly spectacle of commenting on others’ cases. Such comments could affect the result, or be seen by the judge before whom the case is pending as public judicial pressure to decide the case in a certain way. It also undermines public confidence in the decisions of the court. [Fn. omitted.]” (Rothman, Cal. Jud. Conduct Handbook, supra, § 5.32, p. 142, italics added.)
This commission has disciplined a judge for commenting to the media about a case pending on appeal. (Com. on Jud. Performance, Ann. Rep. *CJP Supp. 125 (1997) Advisory Letter No. 32, p. 23.) Judge Ross’s public media comments about the pending Ghilotti appeal were improper.
2. Conclusions of Law
The primary legal issue concerning Judge Ross’s comments on the Ghilotti case is whether an exemption under canon 3B(9) applies. It provides in pertinent part as follows: “Other than cases in which the judge has personally participated, this Canon does not prohibit judges from discussing in legal education programs and materials, cases and issues pending in appellate courts. This educational exemption does not apply to cases over which the judge has presided or to comments or discussions that might interfere with a fair hearing of the case.” (Canon 3B(9), italics added.)
The masters construed “legal education programs and materials” broadly and found that it encompasses legal education of the public; they concluded that Judge Ross’s explanations on the March 4 program came within the exemption. As we explain, we have reached a different conclusion. The concept of “legal education” is more limited; it refers to education of legal professionals. In the immediately preceding sentence of canon 3B(9), there is an express provision allowing for judges to explain “for public information the procedures of the court.” Thus, in the canon itself, there is a distinction between discussing issues pending in appellate courts in “legal education programs and materials” and informing the public about “procedures of the court.”
The history of canon 3B(9) is instructive. It derives from the American Bar Association (ABA) Model Code of Judicial Conduct. In the 1972 version of the model code, there was the following blanket restriction: “A judge should abstain from public comment about a pending or impending proceeding in any court.” Prior to 1992, the California Code of Judicial Conduct was only slightly less restrictive: canon 3A(6), as it existed then, included the same basic ABA model code prohibition for judges and required them to demand similar abstention by subordinate court staff. The predecessor of the current “public information” exception of canon 3B(9) also was part of the pre-1992 canon 3A(6): “This subsection does not prohibit judges from making public statements in the course of their official duties or from explaining for public information the procedures of the court.”
In 1990, the ABA culminated a three-year review process with the promulgation of a revised model code. The prohibition against comment on pending cases was relaxed slightly to provide: “A judge shall not, while a proceeding is pending or impending in any court, make any public comment that might reasonably be expected to affect its outcome or impair its fairness or make *CJP Supp. 126 any non-public comment that might substantially interfere with a fair trial or hearing.” (1990 ABA Model Code Jud. Conduct, canon 3B(9).)
The change was adopted following substantial debate among both commentators and ABA members. (See Moser, The 1990 ABA Code of Judicial Conduct: A Model for the Future (1991) 4 Geo. J. Legal Ethics 731, 732-735.) Among the criticisms at the time of the 1972 rule was that “it was over-broad and its literal terms were frequently violated by judges making perfectly proper comments about cases when teaching law, explaining procedure, and addressing judicial conferences.” (Id. at p. 749.) Indeed, among the specific comments included in a compendium that was part of the final submission to the ABA House of Delegates meeting in August 1990 (at which the new model code was adopted), was the following comment, referring to what became the 1990 ABA Model Code of Judicial Conduct version of canon 3B(9): “The section as presently worded is simply too restrictive. ‘Any public comment’ clearly includes law teaching and law writing. The second to the last sentence should be amended as follows: ‘This section does not prohibit judges from making public statements in the course of their official duties, or from commenting publicly about proceedings pending in courts other than the judge’s own court while engaged in law teaching or law review or text writing, or from explaining . . . .’ ” (ABA Standing Com. on Ethics and Prof. Responsibility, Rep. to the House of Delegates No. 112 (Aug. 1990), appen. D, com. 31, p. 14, original underscoring.)
Although the issue of a “legal education” exception was raised in the ABA deliberations, as noted, it was not adopted as part of the 1990 ABA Model Code of Judicial Conduct. However, in California, “the California Judges Association began review of the 1990 Model Code later that year, culminating in the adoption of a revised California Code of Judicial Conduct on October 5, 1992.” (Cal. Code Jud. Conduct (1992) preface, f 4.) For the first time, the following appeared in the “Commentary” to the newly numbered canon 3B(9)—the former canon 3A(6)—in the 1992 California code: “Other than cases in which the judge has personally participated, this Canon does not prohibit judges from discussing in legal education programs and materials cases and issues pending in appellate courts.”[10]
The “legal education” exemption in California derives from the comments on the 1990 ABA Model Code of Judicial Conduct. Based on the historical *CJP Supp. 127 development, we are convinced that the exemption arises out of the desire to clarify judges’ right to engage in up-to-the-minute discussions among themselves or with lawyers of pending appellate cases. Indeed, one commentator, in discussing the unusual “education exception” of the California canon, discusses it under the heading “Scholarly Teaching and Writing.” (Gray, Commenting on Pending Cases in Key Issues in Judicial Ethics (American Judicature Society 2001) pp. 15-16.) Judge Rothman discusses the provision in the section of his treatise entitled Legal Education Programs (Rothman, Cal. Jud. Conduct Handbook, supra, § 5.35, pp. 144-145); he has a separate subdivision, Communicating with the Media (ch. 5, pt. H, subd. B) that includes the section entitled Making Television Appearances (id., § 5.38, p. 146). Judge Rothman’s delineation suggests the distinction that we determine to be applicable.
Thus, we conclude that the “legal education” exemption of canon 3B(9) allows only limited comment on pending appellate cases, as described, and does not extend to general public outreach activities by a judge. Judge Ross’s comments about the Ghilotti appeal on the March 4 segment of Life & Times Tonight were not permitted under canon 3B(9).
The masters viewed Judge Ross’s televised comments on Ghilotti as a technical violation, at most, and one that was not sufficiently serious to have brought the judiciary into disrepute. We cannot agree. The judge’s comments about the Ghilotti family wealth, the defendant’s charisma, the fact that people were watching, and the reckless suggestion that politics may drive the outcome of the case were both unseemly and potentially prejudicial to the litigants. The comments also risked undermining public respect for the court’s ultimate decision in Ghilotti and for the court in general. We determine that Judge Ross committed prejudicial misconduct with his unwarranted and inappropriate comments.[11]
C. COUNTS 3C & 3D: COMMENT ON INGLEWOOD POLICE OFFICERS CASE
1. Findings of Fact
During the summer of 2002, a criminal case was pending in the Los Angeles Superior Court against two Inglewood police officers charged with assaulting a minor during an arrest that was videotaped. The arrest and *CJP Supp. 128 alleged police misconduct had generated widespread media coverage and substantial local controversy. Judge Ross had no judicial responsibilities concerning the case, but made comments concerning it during two appearances on Life & Times Tonight while the case was pending.
We adopt and summarize the masters’ findings. During the program segment broadcast on July 22, 2002 (the subject of count 3C), Judge Ross responded to the host’s questions about “confusing” layers of prosecuting agencies and courts. He explained the roles of the various entities in the prosecution of a criminal case against a police officer. He emphasized the concept of presumption of innocence and cautioned against prejudgment notwithstanding the videotape. The judge also commented on a potential effect of the charges against the officers on other criminal cases in which the officers had been involved.
On the program of August 15, 2002 (the subject of count 3D), the host expressed concerns whether the officers’ case was being transferred to a less racially diverse jurisdiction in order to benefit the officers. Judge Ross responded with an objective explanation concerning the distinction between changes of venue and transfers within the same court district. He explained the authority of a trial judge to order a change of venue based on statutory factors, pointing out that the key determination concerning venue was whether the defendant would receive a fair trial. The judge also described geographical areas from which jury pools are drawn after court unification, and the concept of juror challenges.
2. Conclusions of Law
As noted previously, canon 3B(9) permits a judge to comment publicly on a pending case for purposes of “explaining for public information the procedures of the court.” The masters conclude, based on their review of the program transcripts, that Judge Ross’ s comments during the two program segments fit within the exception. We concur, based on our review of the transcripts, that the comments were permissible under the “public procedural information” exemption to canon 3B(9). We conclude that no misconduct was proven under counts 3C or 3D.
VI. COUNT 4: MOBILE COURT PRIVATE ARBITRATIONS
The final count charges Judge Ross with misconduct in acting as a private arbitrator during filming of a pilot television program for a possible new series, tentatively known as Mobile Court. He is alleged to have violated canons 1 and 2A (by creating an appearance of impropriety and undermining *CJP Supp. 129 the integrity and independence of the judiciary), 2B(2) (by using the prestige of office to advance his and others’ pecuniary interests), 4A(2) (by engaging in off-bench activities that demeaned the judicial office), 4D(l)(a) (by engaging in financial and business dealings that may reasonably be perceived as exploiting the judicial position), 4D(2) (by participating in a business venture or commercial advertising, or permitting others to use the judge’s title, or otherwise lending the prestige of office to promote a commercial venture) and 4F (by acting as a private arbitrator).
The masters concluded that Judge Ross violated all of the foregoing canons in connection with arbitrating the Mobile Court cases, and that he committed prejudicial misconduct. We agree as to the canon violations, but determine that he committed willful misconduct. Additionally, the masters suggested Judge Ross was not telling the truth in parts of his testimony concerning Mobile Court. We conclude that Judge Ross’s pervasive lack of candor and accountability throughout these proceedings was especially pronounced as respects the charges of court 4.
1. Findings of Fact Concerning Basic Charges
We adopt and summarize the findings of the masters concerning the basic facts. During the summer of 2002, a television producer contacted Judge Ross and ultimately invited him to audition for the role as a judge/host for a proposed reality television series. The tentative name for the series was Mobile Court, reflecting the theme of the show, which was for an actual judge to resolve actual cases, but in “court on location,” taking “justice from the courtroom to the streets.”
Judge Ross agreed to audition for the position of judge/host of the program. Following the audition and numerous discussions with the producer’s agent, the judge signed a contract with the producer in mid-July 2002. Judge Ross utilized the services of a talent agent, and also was assisted in the contract negotiations by an attorney agent whom he knew from his tenure in the district attorney’s office. The contract gave the producer the “exclusive, independent irrevocable option ... to engage [Judge Ross] to render on-camera judge/host services in connection with [the] television series . . . ,” and obligated Judge Ross to provide these services after February 1, 2003, if the television pilot was purchased. Judge Ross warranted in the agreement that he was “free to enter into this Agreement” and that he was “not subject to any conflicting obligation. . . .” (Original italics.)
Judge Ross testified that he knew he would need to resign from the bench if he was chosen to host the series. He also testified that a television career was very appealing to him because it would “only require [him] to work six *CJP Supp. 130 months out of the year.” The masters presumed, as do we, that Judge Ross was aware, further, of the “potential monetary and other substantial benefits of a successful television career.”
The pilot show was filmed on the weekend of July 27 and July 28, 2002. The producers intended to use the pilot solely for marketing the show to television producers. In the pilot, Judge Ross arbitrated two actual pending cases that had been filed as small claims matters. A videotape of the pilot was submitted into evidence and both the masters and we have viewed it. Judge Ross is identified in the pilot as “Judge Kevin Ross.” He appears in each case in a dark suit with a uniformed bailiff who announces that the witnesses have been sworn, that Judge Kevin Ross is “presiding,” and that “Mobile Court is now in session.” Judge Ross testified that the bailiffs were off-duty deputies from the sheriff’s department, hired by the producer.
The first case, entitled on the film as “Revenge and Rotten Eggs,” involved cross-claims of a teenage boy and two teenage girls for damage to two vehicles, allegedly caused by rotten eggs having been thrown on the vehicles. The filming took place on a residential street with numerous spectators. During the show—or the “hearing”—the parties engaged in nasty name calling, personal insults and derogatory language; they generally ignored Judge Ross’s repeated admonitions that they were required to follow his “rules.” Judge Ross held several “side-bar” discussions during which he questioned the respective parties, and then issued his decision on camera in favor of the teenage boy.
The second program case is entitled “Beauty and the Beast.” An “erotic model” using the stage name Angel Cassidy sued the “Dream Girls” adult club in San Diego, claiming that the club cheated her out of prize money because the security guard (identified on film as “Wolverine”) disqualified her from the final round of a “Miss Wet on the Net” contest. The filming took place inside a Los Angeles strip club—described as such on the video. The parties again engaged in substantial name calling and exchanged derogatory and insulting remarks that Judge Ross was unable to control.
Prior to the filming, the parties to the two actual small claims cases (and show participants) signed arbitration agreements in which they consented to submit their disputes to “Judge Kevin Ross” for binding arbitration and to dismiss their small claims court cases. The producer agreed to pay any monetary judgments that were awarded. Judge Ross was given written summaries of “evidence” and witness statements for each case; the summaries stated the cases had been filed in the court as small claims actions. The judge was not told how to decide the cases; rather, his decisions were based on the written summaries, as well as the on-camera assertions of the claimants and other “witnesses.”
*CJP Supp. 131 After the filming, each party signed a form letter printed on Mobile Court letterhead, stating that the case had been resolved in private arbitration, and formally asking the small claims division of the respective courts to dismiss the case with prejudice. Judge Ross signed a document for each case, again on Mobile Court stationery, entitled in large capital black letters, “ARBITRATOR’S AWARD.” Next to his signature on each award is the date “7/29/02,” the Monday following the weekend filming. The date appears to have been written with the same pen as Judge Ross’s signature on each respective document. The documents state the amount of money awarded to the prevailing party in each respective case. Judge Ross received $5,000 in compensation for his work on the pilot, which he turned over to the Judicial Resources Office, net of taxes. He paid his talent agent her percentage of his earnings from his personal funds.
The producer then used the pilot to make sales presentations to several groups of executives in the broadcasting field. The presentation included marketing the fact that Judge Ross “was an actual legitimate judge in Los Angeles” because the promoters thought that would “lend . . . credibility to the show” and increase the opportunity to sell the series to an interested buyer.
On August 4, 2002, articles about the proposed Mobile Court show appeared in online and print versions of a leading entertainment industry trade publication, Variety. The articles included the statement that the proposed syndicated series would be “hosted by Judge Kevin Ross, who gets dispatched into the streets by car with his bailiff . . . .” (Original italics.)
Judge Ross testified that he “did go out and actually go get a copy” of Variety. He described his reaction as follows: “And at that point, I was like, ‘Okay, I’m going to end up being kicked off the bench’ because I know that this is something that can’t be done. So that was something that I was—I was very upset.” The judge testified that the producers and their agents had assured him orally that they would not use his judicial position for marketing purposes. However, neither the judge nor his agent nor his attorney ensured that the alleged assurance was reduced to writing, either as part of the general contract between the judge and the producer, or otherwise. Ultimately, the show was not purchased or developed into a series.
2. Findings of Fact Concerning Judge Ross’s Defenses
a. Judge’s Assertion That He Did Not Know He Was Acting As an Arbitrator: With exceptions not applicable here, canon 4F prohibits a judge from acting as a private arbitrator. By the time of the masters’ hearing, Judge Ross conceded that he then realized he had violated canon 4F by arbitrating *CJP Supp. 132 the small claims cases he decided during the filming of the pilot. He testified, though, that as of the time of the filming, he was unaware he arbitrated the cases. The masters rejected this claim as false, as follows: “Based on the evidence presented, we find that when Judge Ross was participating in the Mobile Court project he had to have known and understood that he was retained to serve as a private arbitrator and, in fact, did so. Most important, Judge Ross signed two documents, each entitled ‘ARBITRATOR’S AWARD,’ that awarded money to each plaintiff according to Judge Ross’s stated findings. . . .”
Not only did Judge Ross sign the two awards, but his testimony concerning the signing is false. Judge Ross claims that he signed the arbitration awards during a very hectic period while having makeup applied prior to the actual filming that took place on Saturday, July 27, and Sunday, July 28, 2002. The documents bearing the judge’s signature, however, are dated Monday, July 29, after the filming was complete. Clearly, Judge Ross was not in the process of having makeup applied while getting ready for the camera on Monday.
Judge Ross’s signature and date on each arbitration award appear to be written with the same pen on each respective document. This is particularly apparent on exhibit 75, the award for the “Beauty and the Beast” case. Although there was no specific testimony on the subject, Judge Ross has never asserted, either to the masters or to the commission, that he did not sign and accurately date both awards. We are confident the awards were signed on Monday the 29th, and not while makeup was being applied prior to filming on Saturday or Sunday.
As noted by the masters, it “does not make sense” that Judge Ross signed the awards before the filming. The awards are just that—the arbitrator’s decision after the “hearing.” Further, by Judge Ross’s own admission those decisions did not occur before filming: he made his decision during the filming and was not told what decision to reach. Additionally, the basic premise of the show was that the judge was going to decide actual disputes, a fact that further undermines the judge’s claim that he did not know he was acting as an arbitrator when he was doing so.
The judge’s testimony concerning the circumstance of the signing of the awards was preceded by a question from the examiner, “Did you actually think at the time that judges were allowed to act as arbitrators privately?” The question clearly sought to elicit the judge’s understanding as of the time of the filming concerning the ethical propriety of his engaging in private arbitration.
*CJP Supp. 133 Judge Ross’s initial reply to the question was that he “really did not see it as what would be considered officially arbitration and mediation” and that until he received copies of the awards through discovery, he did not recall signing the arbitration awards. This was followed by his description of the hectic scene, prefilming, when makeup was being applied.
The following exchanges then took place between the examiner and Judge Ross:
“Q. Are you saying that you were never told by anyone involved with Mobile Court that these cases were going to be arbitrated by you?
“A. I’m not saying that.
“Q. Who told you they were going to be arbitrated?
“A. I don’t recall.
“Q. But someone did tell you that you were going to be doing arbitration?”
Judge Ross gave a lengthy and evasive response concerning whether “someone” had told him, the essence of which was summed up in the following: “And it was—again, it was this performance. So that’s really what I went into it thinking, that I was kind of going through this role-playing performance situation.” Continuing, the judge claimed that he thought the only difference between his audition for the role and the actual filming was that in the latter situation, “we were actually going to make it look as real as possible,” to enhance marketing potential.
The examiner then showed Judge Ross copies of the arbitration awards and asked him whether his position was that he did not know he had arbitrated the cases until he received those documents in discovery. The judge gave another rambling and evasive reply that included a repetition of his claim that he was distracted while “I’m in a trailer, and I’m having someone applying makeup . . . .”
The examiner’s exchange with Judge Ross on this subject concluded with the following:
“Q. My question goes to your state of mind at the time you participated in all the Mobile Court dealings. In your mind, you had not engaged in arbitration. Is that right?
“A. I think I’ve already indicated what my state of mind was, Mr. Coyle. I’m comfortable with that.
*CJP Supp. 134 “Q. Can you answer that question yes or no?
“A. I don’t think—that’s not really a question I can answer yes or no. I’m not trying to be evasive, but I indicated, again, that at the particular moment when this came up, had I been sitting in a lawyer’s office and/or sitting in a courtroom, that the circumstances would reflect one of, well, you really should have known this. That wasn’t the situation. I’m in a trailer, and I’m having someone applying makeup, and I’m having someone say, ‘Okay, let’s try this tie. And by the way, what about the W-2 forms? Judge Ross, have you eaten yet? Oh, by the way could you look at this other piece of paper. You know, you didn’t sign this document here.’ So all these things were going on. They don’t excuse the fact that I signed an arbitrator’s award. It doesn’t excuse the fact that that’s a direct violation of the canon. And so I accepted responsibility from day one."
The patent attempts at avoidance, mixed with the false story about the makeup and other confusion prefilming, demonstrate serious lack of candor and accountability. They also highlight the hollowness of the final claim by the judge in the just-quoted excerpt that he “accepted responsibility from day one.”
Judge Ross continues in his efforts to avoid admitting conscious knowledge of wrongdoing. In his findings that he proposed to the masters following the hearing, he suggested that they should find that he “unintentionally” engaged in arbitration.
In his posthearing briefs to the commission, Judge Ross glosses over the details of the arbitrations, although he does “concede” wrongdoing. In his recitation of the facts in his opening brief, the judge omits any mention of the arbitrator’s award documents that he signed. Later, he makes a passing and misleading reference to those documents, as follows: “Respondent realizes he was unclear as to when he signed the documents but does not dispute these actions.” (Italics added.) To the contrary, he was quite clear, repeatedly and falsely, that he signed the awards while makeup was being applied.
In the judge’s reply brief, he accuses the examiner of being “intentionally misleading" in asserting that Judge Ross was unwilling to admit that he knew he was acting as an arbitrator. Again, the judge points the finger of blame at someone else—unjustifiably so, in that what the examiner asserted is precisely what the masters expressly found, namely, that “Judge Ross has been unwilling to admit that he knew he was acting as an arbitrator when the pilots were filmed.” The judge has been and is unwilling to acknowledge his true state of mind.
Judge Ross states that he now “understands” that private arbitration is prohibited, and that he “fully understands” that he acted as an arbitrator. The *CJP Supp. 135 belated concessions, however, miss the point that Judge Ross has repeatedly refused to concede in the face of compelling evidence that he had to have known at the time of the filming that he was engaging in arbitration.
b. Judge Ross’s Claim That He Asked and Expected the Producer Not to Use His Title in Promoting the Show: The masters correctly concluded that Judge Ross violated several canons because he used his judicial position for financial advantage, and used the prestige of office to engage in a commercial or business enterprise. In an attempt to avoid this conclusion, Judge Ross testified that he asked the producer not to use his judicial title in marketing the show and that he expected his request would be respected. The masters concluded that since the judge failed to have this limitation reduced to writing, his efforts were inadequate to ensure that a violation of the canons would not ensue.
Beyond the foregoing, with which we agree, the claim is inherently unbelievable. Judge Ross was selected as the host because his judicial position enhanced the show’s credibility, reliability and marketability. There was an underlying premise of marketing him as a judge as a way of selling the program. The judge was willing to allow himself to be marketed as a judge in hopes that he then could leave the bench for a more lucrative career in television. His claims that he directed and expected that he would not be marketed as a judge are not credible.
c. Judge’s “Contract” Claim: Judge Ross urges that it was acceptable for him to participate in the pilot filming because he “never made a final decision to do the show.” The masters rejected the claim based on the contract, under the terms of which Judge Ross did not have the right to withdraw. We agree with the masters. Furthermore, the contractual formalities are irrelevant to the ethical violations that occurred.
3. Conclusions of Law
The masters’ summary legal conclusions were that Judge Ross’s participation in the Mobile Court arbitrations “violated judicial canons prohibiting judges from: (1) serving as private arbitrators; (2) using their positions to obtain benefits for themselves and others; and (3) conducting themselves in a manner that is undignified and brings disrepute to the judiciary.” We concur and adopt these summary conclusions; we also summarize and adopt the following reasoning of the masters respecting these conclusions.
Judge Ross violated canon 4F which prohibits a judge from acting as a private arbitrator. Notwithstanding the judge’s evasion of the question of *CJP Supp. 136 whether he knew at the time that he was violating the canon, he concedes now that he in fact did violate it.[12]
The judge’s participation in the Mobile Court program also conflicted with three canons prohibiting judges from using their judicial positions for financial advantage for themselves or others, and from using the prestige of office to engage in a commercial or business enterprise. (Canons 2B(2), 4D(l)(a), 4D(2).) As noted previously, the underlying premise of the proposed new “reality” series was to have a “real judge” as host. Authenticity of the judge, and the concept of taking justice to the street—resolving actual cases “at the scene”—were core themes of the show and key underlying marketing strategies. The judge was among those who stood to realize substantial financial benefits if the pilot had been purchased and aired. The judge admitted that he understood these facts, at least as pertained to his own potential to benefit, and that he would be required to leave the bench if the project succeeded.
The videotape of the “judicial” proceedings is degrading to Judge Ross and to the judiciary. In the “Revenge and Rotten Eggs” installment, the “trial” was held in the middle of a street, with a substantial public gathered around, as the parties called each other names and disrespected Judge Ross and “his rules.” The “courtroom” for the “Beauty and the Beast” case was a strip club, which Judge Ross described on the program as a location with “zebra carpet, neon, mirrors, pole front and center. . . .” The garish surroundings were apparent on screen; it was inappropriate for the judge to draw attention to props that were created for a striptease act, not for the dispensing of justice. Similarly, it was inappropriate for Judge Ross repeatedly to ask the plaintiff (the “erotic model”) to detail the components of a “wet T-shirt contest.” The judge knew his conduct was unjudicial; upon seeing even a benign description of the show and the use of his title in Variety, he thought he would be “kicked off the bench.”
The videotape was not shown to the general public. It was, however, seen by broadcast executives, and the unjudicial activities were witnessed by those who participated in and attended each filming. That is sufficient opportunity for disrespect to be brought upon the judiciary. “It is enough that the conduct be known to those members of the public who observed it.” {Dodds, supra, 12 Cal.4th at p. 173.)
The masters concluded that Judge Ross’s involvement in the Mobile Court venture constituted prejudicial misconduct. They reached this conclusion based on the determination that one element of willful misconduct under the three-pronged Broadman standard—that the judge be acting in a judicial *CJP Supp. 137 capacity—was lacking. (Broadman, supra, 18 Cal.4th at p. 1091.) We conclude that he was acting in a judicial capacity and, thus, that there was willful misconduct.
The Supreme Court has included a variety of activities within the definition of “judicial capacity.” (Dodds, supra, 12 Cal.4th at p. 172.) Generally speaking, it has reference to a judge performing “judicial functions,” that is, “one of the varied functions generally associated with his position as a judge . . . .” (Ibid.; see Adams II, supra, 10 Cal.4th at p. 910.) Additionally, however, and as pertinent here, it also is defined to include the following: “[I]f a judge uses, or attempts to use, his authority as a judge for improper ends, regardless of location, we consider the judge to be acting in his judicial capacity.” (Dodds, supra, 12 Cal.4th at p. 172, citing Kennick v. Commission on Judicial Performance (1990) 50 Cal.3d 297, 319 [267 Cal.Rptr. 293, 787 P.2d 591]; accord, Broadman, supra, 18 Cal.4th at p. 1104.)
Arbitration is not necessarily a “judicial function” in that persons other than judges frequently act as arbitrators. Also, the prohibition of canon 4F against a judge performing arbitration in a “private capacity” suggests that a sitting judge who improperly acts as an arbitrator is not acting in a judicial capacity. In other words, Judge Ross could have done private arbitration in his capacity as attorney or private citizen, in which case there arguably would have been no involvement of “judicial function.” In such instance and under this theory, the wrongdoing would have amounted to prejudicial, not willful, misconduct.
Judge Ross, however, was not acting in his capacity as attorney or private citizen during the Mobile Court arbitrations. He was required to be a judge and act as a judge in order to get the job and perform the role of onscreen arbitrator. It was a key premise of the reality TV show and a condition for the marketing scheme that Judge Ross be, and perform the role of arbitrator as, an actual judge. It was a program requirement that Judge Ross act in a judicial capacity. While acting as a private arbitrator, the judge also engaged in the improper end of using the prestige of his office and his authority as a judge, in an attempt to leverage his status as a bench officer for financial gain. He was acting in a judicial capacity, and the underlying venal purpose constitutes willful misconduct.
VH. DISCIPLINE
A. PURPOSES OF JUDICIAL DISCIPLINE
The starting point for our decision concerning the appropriate level of discipline to impose on Judge Ross is the Supreme Court’s admonition that *CJP Supp. 138 the purpose of judicial discipline “ ‘is not punishment, but rather the protection of the public, the enforcement of rigorous standards of judicial conduct, and the maintenance of public confidence in the integrity and independence of the judicial system.’ ” (Broadman, supra, 18 Cal.4th at pp. 1111-1112, citing Adams II, supra, 10 Cal.4th at p. 912.)
B. RELEVANT STANDARDS FOR DETERMINING DISCIPLINE
Based on Supreme Court decisions, the commission has identified several factors that are relevant to determining appropriate discipline: the number of acts of misconduct; the existence of prior discipline; whether the judge appreciates that he or she committed misconduct; the judge’s integrity; the likelihood of future misconduct; and the impact of the misconduct on the judicial system. (Inquiry Concerning Van Voorhis (2003) No. 165, Decision and Order Removing Judge Van Voorhis from Office, p. 31 [48 Cal.4th CJP Supp. 257, 295]; Inquiry Concerning Hyde (2003) No. 166, Decision and Order Removing Judge Hyde from Office, p. 27 [48 Cal.4th CJP Supp. 329, 363].) In addition, court decisions (e.g., Adams II, supra, 10 Cal.4th at pp. 908-911; Doan, supra, 11 Cal.4th at pp. 338-339) make clear that it is also relevant here that the misconduct involves moral turpitude and corrupt intentions. And, as noted at the outset, honesty is a minimum qualification for every judge. (Kloepfer, supra, 49 Cal.3d at p. 865.) We apply these standards to the facts here; in many respects, the various considerations overlap one another.
1. Number of Acts of Misconduct
The Supreme Court has stated that the number of acts of misconduct is relevant to the question of discipline, but not according to any rigid formula. (Furey v. Commission on Judicial Performance (1987) 43 Cal.3d 1297, 1307 [240 Cal.Rptr. 859, 743 P.2d 919].) Judge Ross engaged in four acts of willful misconduct, two acts of prejudicial misconduct and one act of improper action. Under the California Constitution, improper action is not a basis for censure or removal (Cal. Const., art. VI, § 18, subd. (d)); accordingly, we do not consider the judge’s improper action, that is, the basic underlying misconduct of talking by telephone with Ms. Carrillo in count 1A, in reaching our determination to remove Judge Ross from office. “ ‘The number of wrongful acts is relevant to determining whether they were merely isolated occurrences or, instead, part of a course of conduct establishing “lack of temperament and ability to perform judicial functions in an even-handed manner.” [Citation.]’ ” (Fletcher, supra, 19 Cal.4th at p. 918.)
Based on our determination of repeated wrongdoing by Judge Ross, compounded by his pervasive lack of candor and accountability and the fact *CJP Supp. 139 that he has prior discipline for misconduct similar to certain of the wrongdoing present in these proceedings (discussed immediately following), we are satisfied that a course of conduct has been clearly established. The evidence we have discussed convinces us beyond any doubt that Judge Ross has demonstrated that he lacks the temperament and ability to perform judicial functions in an evenhanded manner.
2. Prior Discipline
The commission previously disciplined Judge Ross with an advisory letter issued on February 14, 2001. The misconduct that was the subject of the earlier discipline was similar to that involved here, as found by the masters. It involved abuse of authority, acting in derogation of the attorney-client relationship and the right against self-incrimination, and conducting proceedings that lacked decorum and were demeaning and humiliating to defendants. The wrongdoing that has been proven in these proceedings began on January 15, 2001—four months prior to the advisory letter—with the improper comment on the juvenile case on Life & Times Tonight—followed six months after the advisory letter with the Carrillo hearing on August 23, 2001.
3. Appreciation of Misconduct
“A judge’s failure to appreciate or admit to the impropriety of his or her acts indicates a lack of capacity to reform.” (Inquiry Concerning Platt (2002) No. 162, Decision and Order Removing Judge Platt from Office, p. 15 [48 Cal.4th CJP Supp. 227].) We have documented in detail Judge Ross’s unceasing attempts to distance himself from his actions, including by casting blame and aspersions on others. Indeed, his lack of acceptance and accountability is ever present.
During his testimony before the masters, Judge Ross made the following assertions that demonstrate his denial of wrongdoing:
Judge Ross maintained that he was neutral and detached in questioning Mr. AJca, and he did not think he was demeaning toward him, despite cross-examining him like a prosecutor and repeatedly calling him a liar.
The judge denied that he derogated the attorney-client relationship in the Salcido matter, or that he proceeded improperly after evicting DPD Gordon, or that removing counsel from the courtroom affected the attorney-client relationship. The judge asserts he was patient and dignified, despite having called Mr. Salcido a pathological liar in open court.
*CJP Supp. 140 The judge recognized no wrongdoing in revealing on television facts he learned in a confidential juvenile hearing and announcing his intended decision on screen, while the case was still pending before him.[13]
Judge Ross was unwilling to admit that he knew he was acting as an arbitrator for Mobile Court.
When commission member Michael Kahn asked Judge Ross at oral argument “what [he] has learned from this, and how [he] will apply it to individual cases in the future,” the judge was unable to provide a cogent or convincing response that he has learned anything pertinent—despite being invited twice by the chairperson to please answer the question.
Following oral argument before the commission, we asked for supplemental briefs from the parties on the subject of the propriety, or lack thereof, of removal in this case; the parties were asked to assume for purposes of the brief that the commission would adopt the basic findings and conclusions of the masters, and that it had determined that Judge Ross displayed serious lack of candor before the masters and the commission. In response, Judge Ross filed a 24-page brief that again highlights the judge’s inability or refusal to acknowledge what he has done.
At the outset of the brief, under the heading “Summary of Proceedings,” Judge Ross states as follows: “In affirming all the findings made by the Special Masters with respect to these charges, it is clear that the Commission believes that respondent failed to demonstrate strict adherence to the Code of Judicial Ethics. It is also clear that the Commission is deeply concerned that respondent failed to display the utmost candor during appearances before both the Special Masters and the Commission.”
The judge’s choice of modifiers—strict adherence to the canons, and utmost candor—qualifies even his basic description of the issues at hand. They suggest that there were only technical ethical violations and slight deviations from absolute honesty. This same refusal or inability to acknowledge the gravity of the wrongdoing permeates the judge’s brief.
Following the introduction, he sets forth in a series each of the subcounts in which the masters found misconduct. There is an introductory subheading to each subcount in which Judge Ross sets forth what we call a “concession of error.” For example, he begins with the Carrillo case, concerning which he “acknowledges” his misconduct as follows: “Respondent’s [sz'c] recognizes that his sense of compassion cannot override ethical obligations to handle *CJP Supp. 141 cases in a manner consistent with the Code of Judicial Ethics.” Notably, the judge’s “concession” is enveloped in a self-serving comment about his compassion.
In each instance of misconduct, then, the judge includes a purported summary of the facts that constitute the wrongdoing. The descriptions are self-serving and omit the most egregious portions of the wrongful conduct. For example, the judge’s summary heading, or “admission of error,” concerning the Salcido case is as follows: “Respondent recognizes that he failed to show Mr. Salcido the proper respect he was entitled to, demonstrating embroilment and lack of impartiality by accusing him of ‘lying’ and being a ‘pathological liar.’ ” Neither in that heading, nor in the ensuing discussion of the facts, does Judge Ross make any mention of his egregious violations of Mr. Salcido’s fundamental constitutional rights.
Judge Ross continues a similar process with each of the subcounts— offering concessions, the lack of sincerity and depth of which are exposed by the superficial factual descriptions that follow. His attempts to minimize his wrongdoing fail because they are hollow.
In another part of the supplemental brief, the judge also discusses his prior advisory letter. The masters found that the conduct that was the subject of the earlier discipline repeats itself here. Judge Ross does not argue against that observation. Instead, describing the circumstances underlying the discipline, he suggests that his intentions were good, even though he violated defendants’ constitutional rights and otherwise demeaned them. Judge Ross demonstrates again that he is incapable of just admitting his wrongdoing.
4. The Judge’s Integrity
Honesty is a “minimum qualification[]” expected of every judge. (Kloepfer, supra, 49 Cal.3d at p. 865.) A person cannot be a judge if he or she is not honest; other positive qualities cannot redeem or compensate for the missing fundamental. {Ibid.) Judge Ross’s lack of candor is another demonstrated and predominant theme of these proceedings; it is pervasive.
In the Fuentes matter, the judge fabricated stories that the defendant gave him insurance papers, that an unnamed bailiff told him a judge could add charges for false insurance information, that another “identical” case triggered him into realizing he had made a “mess” of the Fuentes matter, that he took prompt action to remedy the prejudice, that he thought the defendant would appear in another court for arraignment even though he had just sent her to jail, that she would be “automatically” released on bail, and that he did not *CJP Supp. 142 just order her released from jail because, even though his clerk told him the defendant was still in jail, “they could not find her.”
In the Carrillo matter, he persists in the false claim that he gave prompt notice to counsel of his ex parte conversation with the defendant. He admits that he made an after-the-fact addition to the court minutes that he gave to his supervising judge, and that he then filed an answer based on the alteration that concededly cannot be true.
In the Aka matter, Judge Ross testified that all probation violation hearings in his courtroom were formal ones. He knew that was not true.
Throughout these proceedings, Judge Ross has refused to admit that at the time he arbitrated the Mobile Court cases, he knew then that he was acting as an arbitrator. The assertion is defeated by overwhelming evidence to the contrary. He persists in his position that he signed the arbitration awards while distracted as makeup was being applied prior to filming, even after the impossibility of that being true—given the postfilming date on the awards— has been pointed out to him repeatedly. The judge’s further assertion that he requested and expected the producer not to promote him and his position is without merit since real-life Judge Ross was the premise of the program and the key to the marketability of the new reality show.
The Supreme Court has denounced conduct such as Judge Ross repeatedly displays here. As to fabricating stories, the court stated in Ryan: “The misconduct in this matter is especially serious because it indicates that the judge was willing to fabricate justifications for a challenged ruling. This is misconduct of the worst kind, evidencing moral turpitude and dishonesty.” (Ryan, supra, 45 Cal.Sd at p. 535.)
As to altering documents, the court commented as follows in Wenger where the judge had backdated an affidavit: Judge Wenger “knew or should have known that it would create a false impression that he had signed on the earlier date.” (Wenger v. Commission on Judicial Performance (1981) 29 Cal.3d 615, 644 [175 Cal.Rptr. 420, 630 P.2d 954].) Even though the affidavit was not submitted to the commission, and it was not clear why the judge had altered the date, the court denounced it as corrupt, based on an inference that whatever the purpose, it was “not the faithful discharge of judicial duties.” {Id. at pp. 644-645.)
As to attempts to mislead the commission, the court has denounced the practice as especially egregious. In Adams II, the court determined that the judge made “material misstatements or omissions” to the commission, concerning which it stated: “There are few judicial actions in our view that *CJP Supp. 143 provide greater justification for removal from office than the action of a judge in deliberately providing false information to the Commission in the course of its investigation into charges of wilful misconduct on the part of the judge.” (Adams II, supra, 10 Cal.4th at p. 914; accord, Fletcher, supra, 19 Cal.4th at pp. 887-891.)
5. Likelihood of Future Violations
Repeat misconduct, such as is present here, indicates an inability to reform. (Doan, supra, 11 Cal.4th at pp. 339-340; McCullough, supra, 49 Cal.3d at p. 199.) Implicit in the lack of reform is the risk of yet further violations in the future.
We are convinced that Judge Ross’s behavior suggests a strong likelihood of future violations. Judge Ross’s misconduct here began before his prior discipline, repeats it in many respects, and becomes far more serious. Furthermore, the judge committed his willful misconduct in the Fuentes matter when he knew he was under investigation by the commission for his wrongdoing in the Carrillo, Aka and Salcido matters. In a previous removal case, the commission noted that the judge “had just received a preliminary investigation letter from the commission. Accordingly, [he] had every reason to scrupulously observe the standards of judicial conduct. Instead, [he committed willful misconduct], . . . Even when the commission’s attention was focused on him, [the judge] could not resist repeating an act of misconduct.” (Inquiry Concerning Hyde, supra, No. 166, Decision and Order Removing Judge Hyde from Office, p. 32 [48 Cal.4th CJP Supp. at pp. 369-370].) The same can be said about Judge Ross.
In a similar vein, during Judge Ross’s oral argument before the commission, faced with the masters’ extensive negative credibility findings, Judge Ross resorted to the same type of evasive answers that led to those findings. Reviewing the questioning by the three judge members of the commission as to why he had not just ordered Ms. Fuentes released from jail {ante, pp. 96-99), the only conclusion one can draw from Judge Ross’s “responses” is that he was actively fabricating.
It is obvious that the prior private discipline did not have its desired deterrent effect. We are convinced that there is a strong likelihood that Judge Ross will commit further misconduct if we do not protect the public and the judiciary by removing him.
6. Impact on Judicial System
We have detailed Judge Ross’s serious infringements of criminal defendants’ constitutional rights, including the multiday deprivation of Ms. Fuentes’s *CJP Supp. 144 liberty without any pretense of due process of law. Beyond the cloud these violations cast over Judge Ross personally, there has been a vicarious besmirching of the reputation of the judiciary in general. The judge has made unseemly suggestions concerning political considerations in the dispensing of justice by our Supreme Court, thus risking that the public will accord the court’s decisions less respect than they rightfully deserve. The protected right of a juvenile to confidentiality was sacrificed on television and the premature on-air announcement of the intended disposition of the juvenile matter demonstrated prejudgment. His attacks on criminal defendants show an uneven temperament, a manifest embroilment and a lack of impartiality.
We are dismayed by Judge Ross’s conduct in and out of the courtroom, culminating in his willingness to be filmed as a judge in a strip club in hopes of being able to market himself off the bench into a more lucrative career. Last but certainly not least, Judge Ross’s pervasive lack of candor is utterly incompatible with the role of judge and impacts on the administration of justice, and the public’s image of it. The adverse consequences of Judge Ross’s conduct are undeniable, and demand that we redress them as best we can.
C. ORDER REMOVING JUDGE ROSS FROM OFFICE
Numerous witnesses testified before the masters concerning Judge Ross’s dedication and talents as a community leader and role model. He is gifted and dedicated to important judicial outreach activities. He brought to the bench excellent credentials by way of schooling and prior work experience. These factors make our task all the more difficult. They have caused us considerable pause and reflection in the time and detail of our deliberations, and in our ultimate decision. However, they do not and cannot mitigate the totality of the wrongdoing or the conclusion that removal from office is required. (See Adams II, supra, 10 Cal.4th at p. 912 [positive qualities of a judge are properly considered as part of the totality of circumstances pertinent to determining appropriate discipline, but do not mitigate willful or prejudicial .misconduct].)
Pursuant to the provisions of article VI, section 18 of the California Constitution, Judge Kevin A. Ross hereby is ordered removed from his judicial office; pursuant to that section of the Constitution and rules 120(a) and 136 of the Rules of the Commission on Judicial Performance, Judge Ross hereby is disqualified from acting as a judge.
*CJP Supp. 145 Commission members Mr. Marshall B. Grossman, Judge Frederick R Horn, Mr. Michael A. Kahn, Mrs. Crystal Lui, Justice Judith D. McConnell, Mr. Jose C. Miramontes, Mrs. Penny Perez, Judge Rise Jones Pichón, and Ms. Barbara Schraeger voted in favor of all the findings and conclusions expressed herein and in the foregoing order of removal and disqualification of Judge Ross. Commission member Patricia Miller is recused and commission member Lawrence Simi did not participate in this matter.
The judge’s petition for review by the Supreme Court was denied on May 10, 2006.

 The answer to which we refer in this decision is Judge Ross’s answer to the first amended notice of formal proceedings, verified by him on September 17, 2004, and filed on September 20, 2004.

 All exhibits to which we refer in this decision were admitted into evidence by stipulation.

 At oral argument before the commission, Judge Ross made a passing reference that “the bail amounts were incorrectly set” as a seeming explanation for the defendant’s nonrelease. It is unclear who he claims allegedly set those wrong amounts, but he appears to suggest it was someone else’s fault the defendant remained in jail for two and one-half days.

 Proposition 36, the “Substance Abuse and Crime Prevention Act of 2000,” was passed by the voters in November 2000 and became effective July 1, 2001. Under it, defendants convicted of nonviolent drug possession charges must be sentenced to probation and drug treatment, rather than incarcerated.

 In “Respondent’s Opening Brief,” Judge Ross argues that the telephone call was proper and was not prohibited by canon 3B(7). In effect, he urges that there is, or should be, an exception to the prohibition against ex parte communications in a Proposition 36 case. There is no such exception.

 It seems clear that when Commissioner Harkavy spoke with Hartsfield about Judge Ross’s improper telephone call, the commissioner was performing legitimate administrative duties, pursuant to canon 3C(3), and was not having an ex parte conversation that was improper under canon 3B(7). Further, the matter pending before the commission concerns formal charges against Judge Ross, not allegations against Commissioner Harkavy.

 Judge Ross used language in the notes that would be consistent with contemporaneous entry—referring to “Wednesday,” “Thursday” and “Friday.” Normally, given that the entries in fact were made subsequent to the actual events, the language more likely would have been “Wednesday, August 29,” “Thursday, August 30,” and “Friday, August 31.”

 The record of these formal proceedings does not reflect whether any of Judge Ross’s supervising judges reported the incident to this commission.

 The court in Broadman was concerned with former canon 3A(6), the pertinent substance of which is carried over to the current canon 3B(9).

 Proposition 190 (amending Cal. Const., art. VI, § 18, subd. (m), eff. Mar. 1, 1995), created a new constitutional provision transferring to the Supreme Court the authority for issuing a code of judicial ethics. In March 1995, the Supreme Court formally adopted the California Judges Association’s 1992 California Code of Judicial Conduct as a transitional measure. The high court then formally adopted the California Code of Judicial Ethics effective January 15, 1996, with amendments effective April 15, 1996. As a result of the amendments, the “legal education” exemption became part of the text of canon 3B(9) as it now exists.

 Because the masters concluded the exemption applied, they found that there was no violation of canon 3B(9), and thus they did not need to reach the issue of the constitutionality of the canon. We conclude that Judge Ross’s First Amendment arguments concerning count 3B fail for the same reasons as we discussed in connection with count 3A concerning the juvenile case, discussed in the text, ante, at pages 121-123.

 The masters twice refer in their report to canon 4F as canon 3F.

 Judge Ross persisted in this position even during oral argument before the commission.